UNITED STATES of America, Plaintiff,

and

State of Minnesota, by its Attorney General, Warren Spannaus, its Department of Health, and its Pollution Control Agency, Plaintiff-Intervenor,

v.

REILLY TAR & CHEMICAL CORPORATION, Housing and Redevelopment Authority of St. Louis Park; Oak Park Village Associates; Rustic Oaks Condominium, Inc.; and Philips Investment Co., Defendants,

and

CITY OF ST. LOUIS PARK, Plaintiff-Intervenor,

v.

REILLY TAR & CHEMICAL CORPORATION, Defendant,

and

CITY OF HOPKINS, Plaintiff-Intervenor,

v.

REILLY TAR & CHEMICAL CORPORATION, Defendant.

Civ. No. 4–80–469.

United States District Court,
D. Minnesota,
Fourth Division.

Aug. 20, 1982.

Edward Schwartzbauer, and Michael Wahoske, Minneapolis, Minn., for Reilly Tar & Chemical Corp.

Francis X. Herman, Asst. U. S. Atty., and Erica L. Dolgin, Atty., Hazardous Waste Section, Land and Natural Resources Div., Dept. of Justice, Washington, D. C., for U. S.

Stephen Shakman and Dennis Coyne, Sp. Asst. Attys. Gen., St. Paul, Minn., for State of Minn.

Allen Hinderacker, Minneapolis, Minn., for City of St. Louis Park.

Joseph C. Vesely, Hopkins, Minn., for City of Hopkins.

James T. Swenson, Minneapolis, Minn., for TCF Service Corp., successor in interest to Rustic Oaks Condominium, Inc.

Laurence Waldoch, Minneapolis, Minn., for Oak Park Village Associates.

MAGNUSON, District Judge.

The United States, the State of Minnesota (the State), the City of St. Louis Park and the City of Hopkins bring these actions against the Reilly Tar & Chemical Corporation (Reilly Tar) under section 7003 of the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. § 6973 (1976 & Supp. IV 1980), and section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9607 (Supp. IV 1980), for alleged contamination of the ground and groundwater in and around the City of St. Louis Park, Minnesota. The United States also asserts a claim against Reilly Tar based upon section 106(a) of CERCLA, 42 U.S.C. 9606(a) (Supp. IV 1980). The State of Minnesota and the cities of St. Louis Park and Hopkins also assert a series of state law claims arising out of the waste disposal practices underlying their federal claims. Reilly Tar has moved for dismissal of the claims for lack of jurisdiction and for failure to state a claim upon which relief can be granted under *Fed.R.Civ.P.* 12(b)(1) and (6). The motions to dismiss are denied.

*Factual Allegations*

The factual allegations as contained in the complaints are as follows.

In 1917, Reilly Tar, an Indiana Corporation, began to operate a plant in St. Louis Park, Minnesota where it refined coal tar into creosote oil and other products, and treated wood products with creosote oil and other preservatives. For fifty-five years, until the plant ceased operations in 1972, Reilly Tar generated chemical wastes which were handled, stored, treated and disposed of at the Reilly Tar site.

In June 1973, the City of St. Louis Park purchased the Reilly Tar site and transferred its ownership to the Housing and Redevelopment Authority of St. Louis Park, a municipal corporation incorporated under the laws of Minnesota. From May 1978 through January 1980, defendants Oak Park Village Associates, Rustic Oaks Condominium, Inc., and Philip's Investment Co. purchased part of the Reilly Tar site from the Housing and Redevelopment Authority. TCF Service corporation is the successor in interest to Rustic Oaks Condominium, Inc. The United States and State of Minnesota named these entities as defendants only to insure that the remedial measures they seek can be fully implemented.

In 1970, the State of Minnesota and the City of St. Louis Park sued Reilly Tar in state court for violating state law concerning air and surface water pollution at the Reilly Tar site. The state amended its complaint in 1978 to allege groundwater pollution. That suit is pending.

Plaintiffs further allege that Reilly Tar spilled, leaked and discharged chemical wastes generated at the Reilly Tar site directly into the ground there, and that the wastes are in the ground at and surrounding the site. These chemicals have leached and migrated into the groundwater beneath and surrounding the site and will continue to do so.

The groundwater beneath the Reilly Tar site is part of a system of several aquifers which supplies water to St. Louis Park and other parts of the Minneapolis-St. Paul Metropolitan area. Many industrial and drinking water wells have been drilled into

the aquifers. Inadequate groutings and casings in some of the wells permit further migration of the chemicals between the aquifers. One well at the Reilly Tar site is 909 feet deep, and is plugged with coal tar at a depth of approximately 590 feet.

St. Louis Park and Hopkins, as well as other municipalities, obtain drinking water for their residents from the system of aquifers extending beneath the Reilly Tar site. During 1978 and 1979, St. Louis Park closed five drinking water wells because the water was contaminated with chemicals from the Reilly Tar plant. In 1981, Hopkins closed a drinking water well for the same reason. Chemicals from the Reilly Tar operation have contaminated the groundwater in one aquifer at least two miles north of the site, and in another at least one and one-half miles east and southeast of the site. Unless preventive measures are taken, leaching and migration of groundwater will continue to move the chemicals from the Reilly Tar site through the aquifers and into the drinking water for the Minneapolis-St. Paul metropolitan area.

Chemical wastes resulting from the refining of coal tar into creosote oil and other products, and the treatment of wood products with creosote oil and other materials, usually fall within three distinct groups: neutral oils, tar acids, and tar bases. Neutral oils include polynuclear aromatic hydrocarbons (PAH) compounds such as fluoranthene, acenaphthene, benzopyrene, benzathracene, pyrene, and chrysene. Tar acids consist of phenolic compounds such as phenol and cresols. Tar bases consist of basic nitrogen compounds such as acridines and naphthylamines.

Some creosote oil causes cancer in animals and has been associated with occupational cases of cancer in humans. The body absorbs creosote oil through the skin, and on ingestion through the intestinal tract. Acute exposure may produce vomiting, vertigo, respiratory difficulties, headaches, and convulsions. Exposure to high concentrations may also cause hypertension.

Many PAH compounds found in wastes resulting from the refining of creosote oil are animal carcinogens and are suspected human carcinogens. In addition, interaction among the various PAH compounds may enhance their carcinogenic and other toxic effects. Some PAH compounds are cocarcinogens, substances which enhance the carcinogenic activity of cancer causing substances.

Phenolic compounds found in the tar acids resulting from the refining of creosote oil are toxic. Ingestion may cause vomiting, paralysis, convulsions, coma and death. Prolonged exposure to phenolic compounds may impair kidney, liver, and lung functions. Phenol is a tumor promoter, which when exposed to certain carcinogens, increases their carcinogenic activity.

Plaintiffs also allege that the substances Reilly Tar disposed of are classified as hazardous substances by regulations promulgated under the Solid Waste Disposal Act Amendments of 1980.

The State, Hopkins, and St. Louis Park each allege that they have incurred substantial expenses because of Reilly Tar's conduct; that their costs and actions were consistent with the national contingency plan; that they have presented their claims to Reilly Tar under 42 U.S.C. § 9612(a) (Supp. IV 1980); and that Reilly Tar has denied liability and taken no action to satisfy their claims.

The United States alleges that since the passage of CERCLA, it has incurred and will continue to incur response costs in responding to the hazard created by the release and threatened release of hazardous substances from the site. It also alleges that Reilly Tar is liable to it for such costs.

*Section 7003 of the Resource Conservation and Recovery Act (RCRA).*

All plaintiffs have brought claims against Reilly Tar under Section 7003 of the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6973.

The section provides in part:

Notwithstanding any other provision of this chapter, upon receipt of evidence that the handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste may present an imminent and substantial endangerment to health or the environment, the Administrator may bring suit on behalf of the United States in the appropriate district court to immediately restrain any person contributing to such handling, storage, treatment, transportation, or disposal or to take such other action as may be necessary. The Administrator shall provide notice to the affected State of any such suit. The Administrator may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and the environment.

§ 6973(a).

Section 7003 is one of the several imminent hazard provisions that Congress has included in environmental statutes. *See* Section 1431 of the Safe Drinking Water Act, 42 U.S.C. § 300i(a) (1976); Section 504(a) of the Clean Water Act, 33 U.S.C. § 1364(a) (Supp. IV 1980); Section 303 of the Clean Air Act, 42 U.S.C. § 7603 (Supp. IV 1980); Section 106(a) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9606 (Supp. IV 1980). Congress broadly drafted these provisions to give appropriate government officials the right to seek judicial relief, or take other appropriate action to avert imminent and substantial threats to the environment or public health. *United States v. Price,* 523 F.Supp. 1055, 1070 (D.N. J.1981).

Reilly Tar seeks dismissal of the section 7003 claims primarily on three grounds. First, it contends that section 7003 is juris-dictional only and provides no substantive standards for determining liability. *United States v. Midwest Solvent Recovery, Inc.,* 484 F.Supp. 138, 143 (N.D.Ind.1980); *United States v. Ottati and Goss, Inc.,* No. C80–225–L, slip. op. at 4 (D.N.H. Oct. 20, 1980). Liability under the statute, it argues, must be based on the federal common law of nuisance,[1] which applies only to pollution having interstate effects. *Reserve Mining Company v. Environmental Protection Agency,* 514 F.2d 492, 520–522 (8th Cir. 1975). No interstate effects having been alleged in this case, Reilly Tar contends the section 7003 claim must be dismissed.

Not all courts have accepted the argument that section 7003 is jurisdictional only, *United States v. Diamond Shamrock Corp.,* No. C80–1857, slip op. at 4 (N.D. Ohio May 29, 1981), and of those that have accepted the argument, some refuse to limit section 7003 to groundwater pollution having interstate effects. *United States v. Solvents Recovery Service of New England,* 496 F.Supp. 1127, 1135–38 (D.Conn.1980). Congress did not intend to restrict section 7003 to the rare instance where groundwater pollution caused by hazardous waste disposal crosses state lines. Conditioning a section 7003 claim on an allegation of interstate effect would be inconsistent with the character of the pollution which is the target of the statute and incompatible with the nature and extent of the federal concern embodied in RCRA. *Id.* at 1139. Section 7003 requires the Administrator to give notice of the suit to "*the affected State.*" 42 U.S.C. § 6973(a). Use of the singular "State" implies that Congress did not intend to limit the statute to imminent and substantial endangerments involving two or more states. The statute neither states nor implies that it is applicable only when the hazardous wastes have crossed state lines,

---

1. No plaintiff in this case purports to be bringing any claim based on federal common law nuisance. The Supreme Court recently held that there is no longer a cause of action for federal common law nuisance in the water pollution area, it having been superceded and pre-empted by congressional enactments. *Milwaukee v. Illinois,* 451 U.S. 304, 317–32, 101 S.Ct. 1784, 1792–800, 68 L.Ed.2d 114 (1981); *Middlesex County Sewerage Authority v. National Sea Clammers,* 453 U.S. 1, 22, 101 S.Ct. 2615, 2627, 69 L.Ed.2d 435 (1981).

and the Court will not so limit it. *United States v. Price,* 523 F.Supp. 1055, 1070 n.3 (D.N.J.1981); *United States v. Solvents Recovery Service of New England,* 496 F.Supp. at 1133–39.

Second, Reilly Tar asserts that section 7003 is limited to injunctive actions to restrain ongoing activities, and because it ceased operations in 1972 there is nothing to enjoin. It also contends the statute was not meant to apply to prior owners of inactive sites.

 Although Reilly Tar no longer engages in ongoing activities at the site, this is no basis for dismissing the action. Other courts have held that a complaint based upon section 7003 need not contain an allegation of ongoing acts of disposal. *United States v. Solvents Recovery Service of New England,* 496 F.Supp. at 1139–41. The statute is aimed at the prevention or amelioration of harmful conditions, rather than the cessation of any particular human conduct. *Id.* Similarly, in *United States v. Diamond Shamrock Corp.,* No. C80–1857 at pp. 7–9, the court held that section 7003 applies to situations where the alleged imminent and substantial endangerment results from acts engaged in before enactment of the statute. Thus, plaintiffs' failure to allege continuing activity at the site is not fatal.

Nevertheless, there is some strength to Reilly Tar's argument that section 7003 cannot be invoked against *prior owners* of inactive sites. The section permits suits to "immediately restrain any person *contributing* to such handling . . . or disposal *to stop* such handling . . . or disposal or to take such other action as may be necessary. . . ." 42 U.S.C. § 6973 (emphasis added). It appears to apply only to persons "contributing to" the condition causing the endangerment. The use of the present tense suggests that the statute affects only those whose present conduct contributes to the threat. Reilly Tar, having sold the property ten years ago, no longer has control of its condition and does not appear to be,

through its action or inaction, a person contributing to the condition giving rise to the endangerment; thus, it does not at first glance seem to be within the class of persons against whom the statute may be invoked.

The court, however, is not interpreting section 7003 in a vacuum and it cannot ignore constructions of the statute by other courts. On strikingly similar facts, the court in *United States v. Price,* 523 F.Supp. at 1072–73, held that section 7003 applied to the prior owner of a site whose waste disposal practices in the early 1970's caused present day groundwater contamination. Counsel for Reilly Tar conceded at the hearing that *Price* is indistinguishable. There the court said:

> We conclude that their sale of the property did not relieve them of their accountability under the statute. We reach this conclusion, in large part, because the actions and inaction of the Price defendants are the primary cause of the hazardous situation that now exists. Although the current owners of the property may well also have a duty to prevent the continued disposal of contaminants from the landfill, it would be inequitable to require them to bear the entire burden of a situation that was largely caused by others. *See Vertrac Chem. Corp., supra,* 489 F.Supp. [870] at 877. More importantly, society's interests in deterring the improper disposal of hazardous wastes and in alleviating serious hazards as quickly as possible mandate that those responsible for the disposal of such wastes not be able to shirk their statutory responsibilities by simply selling the property on which the wastes are stored.

> Our conclusion that the Prices are proper defendants, notwithstanding their sale of the property, is supported, albeit indirectly, by the limited legislative history that is available. In adopting certain amendments to the statute, the Senate recently commented:

> > [S]ection 7003 should not be construed solely with respect to the common law.

Some terms and concepts, such as persons "contributing to" disposal resulting in a substantial endangerment, are meant to be more liberal than their common law counterparts. For example, a company that *generated* hazardous waste might be someone "*contributing to*" an endangerment under section 7003 even where someone "*contributing to*" an endanger-improper disposal site ... where the generator *had* knowledge of the illicit disposal or *failed* to exercise due care in selecting or instructing the entity actually conducting the disposal.

S.Rep.No.172, 96th Cong., 2d Sess. 5, *reprinted in* [1980] U.S.Code Cong. & Ad. News 8665, 8669 (emphasis added) [sic] [1980 U.S.Code Cong. & Ad.News 5019, 5023]. This legislative history reveals two noteworthy points: first, that Congress intended the phrase "contributing to" disposal to be interpreted in a liberal, not a restrictive, fashion; and second, that Congress realized that past acts could presently be contributing to an endangerment and intended those acts to be within the ambit of the statute. Certainly, the Price defendants' improper methods of storing the chemical wastes are presently contributing to the leaking of chemical contaminants into the Cohansey Aquifer no less than the actions of the generators of those wastes who may have failed to exercise care in their choice of a landfill. They are proper defendants notwithstanding their sale of the property, and their summary judgment motion will be denied insofar as the section 7003 claim is concerned.

523 F.Supp. at 1072–73 (footnote omitted).

■ Because of the Price holding, at this stage of the proceedings the court is not prepared to hold that section 7003 cannot be applied to prior owners of inactive sites.

Third, Reilly Tar argues that the facts alleged "do not amount to the sort of disastrous emergency situation required for in-vocation of a provision meant to deal with 'imminent and substantial endangerments.'" It contends that section 7003 may be invoked only in true emergency situations and not as a substitute procedure for chronic and recurring problems that may be dealt with under other statutes.

Guidance as to the meaning of the phrase "imminent and substantial endangerment" may be found in the legislative histories of other statutes using the phrase. The House Committee Report accompanying the Safe Water Drinking Act discusses at length the meaning of the phrase "imminent and substantial endangerment", as that phrase is used in section 1431 of the Act.

The House Report states in part:

In using the words "imminent and substantial endangerment to the health of persons", the Committee intends that this broad administrative authority not be used when the system of regulatory authorities provided elsewhere in the bill could be used adequately to protect the public health. Nor is the emergency authority to be used in cases where the risk of harm is remote in time, completely speculative in nature, or *de minimis* in degree. However, as in the case of *U. S. v. United States Steel,* Civ.Act. No. 71–1041 (N.D.Ala.1971), under the Clean Air Act, the Committee intends that this language be construed by the courts and the Administrator so as to give paramount importance to the objective of protection of the public health. Administrative and judicial implementation of this authority must occur early enough to prevent the potential hazard from materializing. This means that "imminence" must be considered in light of the time it may take to prepare administrative orders or moving papers to commence and complete litigation and to permit issuance, notification, implementation, and enforcement of administrative or court orders to protect the public health.

Furthermore, while the risk of harm must be "imminent" for the Administrator to

act, the harm itself need not be. Thus, for example, the Administrator may invoke this section when there is an imminent likelihood of the introduction into drinking water of contaminants that may cause health damage after a period of latency.

Among those situations in which the endangerment may be regarded as "substantial" are the following: (1) a substantial likelihood that contaminants capable of causing adverse health effects will be ingested by consumers if preventive action is not taken; (2) a substantial statistical probability that disease will result from the presence of contaminants in drinking water; or (3) the threat of substantial or serious harm (such as exposure to carcinogenic agents or other hazardous contaminants).

H.R.Rep.No.1185, 93rd Cong., 2d Sess. 35–36, *reprinted in,* 1974 U.S.Code & Cong. Ad.News 6454, 6487–88.

■ The facts alleged in the complaints are sufficient to establish an imminent and substantial endangerment to health or the environment. Plaintiffs allege that many of the chemicals found in wastes disposed of by Reilly Tar are carcinogens and toxic. For over fifty-five years these wastes were spilled, leaked and discharged directly into the ground at the site, and from there entered and continue to enter the groundwater which is used as a water supply for the City of St. Louis Park and the surrounding area. The City of St. Louis Park has already closed five wells and the City of Hopkins has closed one. Unless preventative measures are taken, the contaminants will continue to move through the leaching and migration of groundwater into the drinking water for the Minneapolis-St. Paul metropolitan area.

■ The court should not grant a Rule 12(b)(6) motion unless it appears beyond doubt that plaintiff is not entitled to relief under any set of facts that could be proved. The court must liberally construe the complaint in plaintiff's favor; take the facts alleged to be true; and give the plaintiff the benefit of all favorable inferences that may reasonably be drawn in his favor. *Stifel, Nicolus & Co., Incorporated v. Dain, Kalman & Quail, Inc.,* 578 F.2d 1256, 1260 (8th Cir. 1978). Applying these rules to the facts alleged, and giving paramount importance to the objective of protection of the public health, the complaints are sufficient to establish an imminent and substantial endangerment to health or the environment under the statute. *United States v. Vertac Chemical Corp.,* 489 F.Supp. 870, 884–85 (E.D.Ark.1980); *United States v. Royal Hardage,* Civ. No. 80–1031–W, slip op. at 4 (W.D.Okl. Dec. 2, 1980).

■ Reilly Tar is correct in stating that section 7003 should not be used as a substitute procedure for chronic and recurring pollution problems that may be dealt with under other statutes. The House Report on section 108(k) of the Air Quality Act of 1967, the original imminent hazard provision, states that the provision is "not intended as a substitute procedure for chronic or generally recurring pollution problems, which should be dealt with under the other provisions of the act". H.R.Rep.No.728, 90th Cong., 1st Sess. 119 (1967), *reprinted in,* 1967 U.S.Code Cong. & Ad.News 1938, 1954. Similarly, as indicated above, the House committee report discussion of the imminent hazard provision of the Safe Water Drinking Act states that "the Committee intends that this broad administrative authority not be used when the system of regulatory authorities provided elsewhere in the bill could be used adequately to protect the public health." 1974 U.S. Code Cong. & Ad.News at 6487–88.

Although the alleged groundwater contamination in this case may be a recurring or chronic problem, it may also be, or develop into, one that presents an imminent and substantial endangerment to health or the environment. The legislative history Reilly Tar relies on indicates only that section 7003 should not be used as a substitute for

other procedures. While section 7003 should not become a *substitute* for other reasonably available and adequate response authorities, it certainly may be used to *supplement* the response actions taken by government agencies under other environmental statutes. Even though response actions under other statutes may also be appropriate in this case, this does not mean that plaintiffs cannot resort to section 7003 as well.

The broad range of response authorities provided by Congress under RCRA and other statutes suggest that it intended to provide the EPA flexibility in tailoring its response actions to the particular problem with which it is dealing. The statutes do not require the EPA to elect either an imminent hazard provision or other statutory response authorities. The facts alleged in the complaint do not establish that other response mechanisms are reasonably available and adequate to meet the threat, or that the government is seeking to use section 7003 as a substitute for such other procedures.

Finally, Reilly Tar contends that the relief sought in the complaints is beyond that contemplated by section 7003, and requests that the prayers for relief be limited accordingly. The scope of the relief to which plaintiffs may be entitled under the statute is a matter more appropriately left to further proceedings.

*Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) Claims.*

On December 11, 1980, after extensive hearing and some last minute amendments, Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, Pub.L.No. 96–510, 94 Stat. 2767 (1980) (codified at 42 U.S.C. §§ 9601–57, Supp. IV, 1980) to provide for liability, compensation, cleanup, and emergency response to hazardous substances released into the environment. *McCastle v. Rollins Environmental Services,* 514 F.Supp. 936, 939 (M.D.La.1981).

CERCLA authorizes state and federal governments to institute actions for the containment, cleanup, and removal of hazardous wastes. 42 U.S.C. § 9604. The Act establishes a Hazardous Substances Response Fund, financed jointly by industry and the federal government. 42 U.S.C. § 9631. The fund is available to compensate state and federal governments for containment, cleanup, and removal of hazardous wastes if the responsible parties cannot be identified or are unable to undertake such activities themselves. 42 U.S.C. 9611, 9612. Section 107 of the Act imposes liability on responsible parties for government response costs and damages to natural resources, subject to specified dollar limits and certain enumerated defenses. 42 U.S.C. § 9607. The statute contains a provision, broader than section 7003 of RCRA, which authorizes judicial action when an imminent and substantial endangerment to the public health, welfare or the environment is caused by an actual or threatened release of a hazardous substance. 42 U.S.C. § 9606. Finally, it requires that the President prepare a revised "national contingency plan" to reflect and carry out the responsibilities and powers created by the Act. 42 U.S.C. § 9605.

The legislative history of the Act deserves some comment. Two different bills proceeded through the House and the Senate. The Senate made certain last minute amendments to its bill, (S.1480, 96th Cong., 2d Sess. 1980), most notably the removal of provisions imposing liability for personal injury caused by hazardous waste disposal. The House then struck the language in its bill, H.R. 7020, 96th Cong., 2d Sess. (1980), and substituted the language of the Senate bill. H.R. 7020, as amended, was eventually enacted. The bill retained the House file number, apparently because of a requirement that appropriations measures originate in the House. Due to the legislative history of the act, the Committee Reports must be read with some caution. Eckhardt, *The Unfinished Business of Hazardous Waste Control,* 33 Baylor L.Rev. 253 (1981);

**1112**

Congressional Quarterly Almanac, 96th Cong., 2d Sess. (1980) at 584–89 (discussions of CERCLA's legislative history).

■ A review of the statute and the Committee Reports[2] reveals at least two Congressional concerns that survived the final amendments to the Act. (First) Congress intended that the federal government be immediately given the tools necessary for a prompt and effective response to problems of national magnitude resulting from hazardous waste disposal. (Second,) Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created. To give effect to these congressional concerns, CERCLA should be given a broad and liberal construction. The statute should not be narrowly interpreted to frustrate the government's ability to respond promptly and effectively, or to limit the liability of those responsible for cleanup costs beyond the limits expressly provided.

### Section 106(a) CERCLA Claims.

The United States asserts a second claim for relief based on section 106(a) of CERCLA. 42 U.S.C. § 9606(a). Section 106(a) is a broadly written imminent hazards provision. It permits the government to bring suit to obtain abatement action whenever the President determines there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance. This section gives the federal courts broad power to grant "such relief as the public interest and equities of the case may require." Section 106(a) provides:

(a) In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.

Reilly Tar first argues that the section 106(a) claim must be dismissed because the complaint does not allege that the President specifically authorized this suit.

■ A section 106(a) claim need not contain an allegation of specific presidential authorization for the suit. Section 115 of CERCLA permits the President to delegate or assign any duties or powers imposed upon or assigned to him under the Act. 42 U.S.C. § 9615. Section 3(b) of Executive Order Number 12316 delegates to the Administrator of the Environmental Protection Agency "the functions vested in the President by Section 106(a) of the Act...." Exec. Order No. 12316, 46 Fed.Reg. 42,237 at 42,238 (1981). Section 8(b) of the Order provides that "[n]otwithstanding any other provision of this Order, the President's authority under the Act to require the Attorney General to commence litigation is retained by the President." *Id.* at 42,240.

■ Section 8(b) of the Order should not be read as requiring specific presidential

---

2. Both the House and Senate Committee Reports express the need for prompt action, concern over inadequacies in existing legislation, and detail the magnitude of the problems caused by hazardous waste disposal in this country. Senate Report of the Committee on Environment and Public Work, S.Rep.No.848, 96th Cong., 2d Sess. (1980); Report of the House Committee on Interstate and Foreign Commerce, H.R.Rep.No.96–1016, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.Code Cong. & Ad.News 6119.

authorization to commence litigation under section 106(a) of the Act. Instead, section 8(b) merely defines the roles the Administrator of the EPA and the Attorney General perform in bringing litigation. Under section 3(b), the Administrator makes the initial determination that there is an imminent and substantial endangerment because of a hazardous release, and also determines whether to begin litigation. The Administrator cannot, however, compel the Attorney General to bring suit. Under section 8(b), the President retains the power to *compel* the Attorney General to commence suit if the Attorney General has declined a request by the Administrator to do so. Therefore, the complaint need not be dismissed because it fails to allege that the President authorized the suit.

Reilly Tar also seeks dismissal of the section 106(a) claim on substantially the same grounds it raised for dismissal of the section 7003 RCRA claims: (1) the statute is jurisdictional only, therefore, liability must be based upon the federal common law of nuisance which applies only where an interstate effect is alleged; (2) the statute does not apply to prior owners of inactive sites; and (3) the complaint fails to allege sufficient facts to establish an imminent and substantial endangerment to the public health, welfare or the environment. Those arguments are without merit.

■ First, section 106(a) neither expressly nor impliedly states that it applies only where hazardous wastes cross state lines, nor should that requirement be read into it. 42 U.S.C. § 9606(a). The language of section 106(a), like that of section 7003 of RCRA, suggests a contrary conclusion. Section 106(a) refers to actions taken by "*a state*" and requires notice to "the affected state." *Id.* The use of the singular "state" suggests that Congress did not intend the

statute to apply only where two or more states are involved. Furthermore, as with section 7003, conditioning a section 106(a) groundwater claim on interstate effects would be inconsistent with the character of the pollution the statute applies to and with the nature and extent of the federal concern embodied in CERCLA.

Although the equitable principles of federal common law nuisance actions may apply to determine what remedies are appropriate,[3] Congress did not intend section 106(a) to incorporate the element of interstate effect required in federal common law nuisance actions. *Cf. United States v. Solvents Recovery Service of New England,* 496 F.Supp. at 1133–39 (incorporating federal common law nuisance into section 7003 but not requiring an allegation of interstate effect).

■ Second, nothing in the language of section 106(a) indicates that it cannot in appropriate circumstances be invoked against the prior owner of a disposal site. Section 106(a) is broader in scope than section 7003 of RCRA, and whatever concerns the court has regarding the applicability of section 7003 to *prior owners* of inactive sites do not apply to section 106(a). Section 106(a) of CERCLA contains no limitations on the classes of persons within its reach. Nor does it contain language indicating that it applies only to present owners of waste disposal sites.

In addition, as noted above, section 106(a) empowers the federal courts to grant "such relief as the public interest and the equities of the case may require." *Id.* This broad grant of equitable power to the federal courts is not limited in its application to those who are the present owners of disposal sites. The equities of this case, as they appear in the complaints, do not suggest that Reilly Tar should escape the statute's

---

**3.** The portion of the statute granting the court the power to grant such relief as "the equities of the case may require" may suggest that reference to federal common law nuisance principles is appropriate. Federal common law

nuisance actions were clearly "equitable" in nature. *Mugler v. Kansas,* 123 U.S. 623, 673, 8 S.Ct. 273, 303, 31 L.Ed. 205 (1887); *Missouri v. Illinois & Chicago District,* 180 U.S. 208, 244, 21 S.Ct. 331, 345, 45 L.Ed. 497 (1900).

reach. *Cf. United States v. Price,* 523 F.Supp. at 1072.

 Third, there is no merit to Reilly Tar's argument that this case does not present the sort of emergency situation that section 106(a) was meant to cover. The earlier discussion on what constitutes an "imminent and substantial endangerment" under section 7003 is generally applicable here as well. Taking the facts alleged in the complaint as true, it cannot be said with positive assurance that there exists no imminent and substantial endangerment to the public health, welfare or the environment.

The Court also notes that section 106(c) of the Act requires the Administrator of the EPA, after consultation with the Attorney General, to establish guidelines for using the imminent hazard, enforcement, and emergency response authorities of this section and other existing statutes to effectuate the responsibilities and powers created by the Act. 42 U.S.C. § 9606(c). These guidelines were published on May 13, 1982. 47 Fed.Reg. 20664 (1982). The guidelines state that the particular authority or authorities to be used, and whether to precede court action with administrative action, will be determined on a case-by-case basis depending upon the most effective approach for achieving the desired site cleanup. *Id.*

 These guidelines, together with the wide variety of response actions available to the EPA under CERCLA and elsewhere, suggest that Congress intended to provide the EPA with flexibility to tailor response actions to fit the circumstances of the individual case. This flexibility clearly indicates that an imminent hazard provision such as section 106(a) may be used simultaneously with other statutory response authorities. While section 106(a) should not become a substitute for other reasonably available response mechanisms, the availability of other response authorities for dealing with chronic and recurring pollution problems does not preclude the simulta-

neous invocation of the imminent hazard provision of section 106.

Accordingly, Reilly Tar's motion to dismiss the section 106 claim is denied.

*Section 107 CERCLA Claims.*

All plaintiffs seek recovery from Reilly Tar for response costs incurred as a result of the contamination under Section 107(a) of CERCLA. 42 U.S.C. § 9607(a). The State of Minnesota has also asserted a claim for natural resource damages under section 107(a)(4)(C). The section provides in part:

(a) Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

. . . .

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

. . . .

(4) . . . from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

(c) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.

*Id.*

 Reilly Tar seeks dismissal without prejudice of all claims for response costs brought under section 107(a), contending that these claims are premature because the national contingency plan revisions called

for by section 105 have not been finally adopted. *See* 42 U.S.C. § 9605. There is no merit to that argument. Congress did not intend final adoption of the revisions to the national contingency plan to be a prerequisite for bringing suit to recover response costs under section 107(a).

Under section 107(a), any person who (1) at the time of disposal of any hazardous substances; (2) owned or operated any facility at which such hazardous substances were disposed of; and (3) from which there is a release which causes the incurrence of response costs; is liable for all costs of removal or remedial action incurred by the United States or a State which are "not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A). The responsible person's liability extends to any other necessary costs of response incurred by any other person "consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B).

Section 101 of the Act defines the "national contingency plan" as "the national contingency plan published under section 1321(c) of Title 33 [Section 311(c) of the Federal Water Pollution Control Act] or revised pursuant to section 9605 of this Act." 42 U.S.C. § 9601(31). Section 105 of the Act requires the President, within 180 days after the enactment of CERCLA, to revise and republish the national contingency plan for the removal of oil and hazardous substances, to reflect and effectuate the responsibilities and powers created by CERCLA. 42 U.S.C. § 9605. This revision is to include a section known as the "national hazardous substance response plan" which shall establish procedures and standards for responding to releases of hazardous substances and pollutants. *Id.* Among other things, the plan is to specify procedures, techniques, materials, equipment and methods to be used in identifying, removing, or remedying releases of hazardous substances comparable to those required under the plan developed under section 311 of the FWPCA. 42 U.S.C. § 9605(1)–(9). Fi-

nally, section 105 provides: "Following publication of the revised national contingency plan, the response to and actions to minimize damage from hazardous substances releases, shall, to the greatest extent possible, be in accordance with the provisions of the plan." 42 U.S.C. § 9605.

Congress enacted CERCLA on December 11, 1980. Pub.L.No.96–510, 94 Stat. 2767 (1980). The statutory deadline for revision and republication of the revised plan was June 9, 1981. 42 U.S.C. § 9605. No revised plan had been published on that date. On February 12, 1982 the District Court for the District of Columbia ordered the EPA to notice the proposed national contingency plan revisions in the Federal Register within thirty days, with notice and opportunity for public comment within thirty days following the notice. *Environmental Defense Fund, Incorporated v. Gorsuch,* Civ. No. 81–2083 (D.D.C. filed February 12, 1982). The EPA was also ordered to republish the revised plan within 90 days of the order. *Id.* The EPA published notice of the proposed plan revisions on March 12, 1982. 47 Fed. Reg. 10,972 (1982). On March 18, 1982, the Court amended its order to allow a total of forty five days for public comment. *Environmental Defense Fund, Incorporated v. Gorsuch,* (D.D.C. filed March 18, 1982); 47 Fed.Reg. 13,174 (1982). ·The EPA published its final version of the revised plan on July 16, 1982. 47 Fed.Reg. 31180 (1982) (to be codified at 40 C.F.R. § 300).

Under Section 305, the revised Plan cannot take effect until Congress has had at least sixty calendar days of continuous session from the date of promulgation in which to review the Plan. 42 U.S.C. § 9655.

Reilly Tar argues that since the Plan has not yet been finally adopted, the section 107 claims must be dismissed as premature. It reasons one cannot determine whether the costs incurred are consistent or inconsistent with a Plan that does not yet exist.

The Reports of both the Senate and House Committees indicate that Congress did not intend revision of the Plan be a

prerequisite to liability under the Act. The Senate Report of the Committee on Environment and Public Works states:

> Removal and remedial actions to protect the public health, welfare and the environment should begin without delay and prior to full implementation of the programs, regulations, plans and procedures required by this Act. The many pressing problems which have led to enactment of legislation should not continue unabated pending such administrative actions. Therefore, actions necessary to protect public health, welfare or the environment should begin as soon as feasible. The nonregulatory authorities for response provided in this Act and other laws should be exercised prior to completion of any necessary planning, administrative and rulemaking responsibilities. However, once completed, such statutorily required planning, administration and final rulemaking shall govern subsequent government response actions.

S.Rep.No.848, 96th Cong., 2d Sess. 62 (1980).

The Report of the House Committee on Interstate and Foreign Commerce states:

> After publication of the plan, response shall be in accordance with the plan to the greatest extent possible.... The Committee does not intend development of the plan to be a prerequisite to the Administrator taking actions under section 3041. The Administrator may utilize the authority of that section prior to the completion of the plan. Once the plan has been developed, the Administrator is required to conform response actions to the plan to the maximum extent practicable.

H.R.Rep.No.1016, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.Code Cong. & Ad. News 6119, 6133.

Although the legislative history does not directly address whether a delay in promulgating the revised plan should bar the commencement of suits under section 107 for the recovery of response costs incurred before the plan is revised, the above comments reflect a Congressional intent that governmental agencies promptly address the problems posed by hazardous waste disposal. Congress could not have intended to penalize agencies for acting promptly in addressing the problem by denying or delaying recovery under section 107(a) for costs incurred before the final adoption of the revised national contingency plan.

Furthermore, section 101 defines the national contingency plan as either the plan promulgated under section 311 of the Federal Water Pollution Control Act *or,* the revised national contingency plan under section 105. 42 U.S.C. § 9601(31). Section 302 also provides that any regulation issued pursuant to section 311 of the Federal Water Pollution Control Act which is repealed or superseded by CERCLA and which is in effect on the date immediately preceding the effective date of CERCLA was to be deemed a regulation issued under CERCLA and to remain in effect unless or until superseded. 42 U.S.C. § 9652(b). Congress intended that the existing plan provide what guidance it could in preparing responses until the revised plan was formulated.

Finally, section 302 states that unless otherwise provided all sections of CERCLA are to be effective immediately upon enactment. 42 U.S.C. § 9652(a). Congress intended that section 107 be effective immediately, even though the revised national contingency plan was not scheduled to be adopted until one hundred and eighty days after enactment.

To impose the interpretation urged by Reilly Tar would penalize those agencies that took prompt action and act as a disincentive to prompt action until the plan is finally adopted. Congress, recognizing the significance of the problem and the importance of immediate responses in many cases, did not intend that final adoption of the revised plan be a prerequisite to begin an action against a private party to recover response costs under section 107(a).

Reilly Tar also seeks to limit liability under section 107(a) to those costs for which response fund expenditures may be made under section 111, 42 U.S.C. 9611, and contends ultimately that the existence of the cooperative agreement between the state and federal government called for by section 104(c)(3), 42 U.S.C. 9604(c)(3), is a condition to liability under section 107. The complexities of defendant's argument require that it be set out in some detail.

Section 112 of the Act sets forth the procedures for filing and determining claims against the Fund. 42 U.S.C. § 9612. Section 112(a) requires a party seeking recovery from either the Fund or a private party to first present the claim to the responsible party. *Id.* If the claim is not satisfied within sixty days, the claimant may elect to commence an action against either the Fund or the responsible party. Section 112(a) provides:

> (a) *All claims which may be asserted against the Fund pursuant to section 9611 of this title* shall be presented in the first instance to the owner, operator, or guarantor of the vessel or facility from which a hazardous substance has been released, if known to the claimant, and to any other person known to the claimant who may be liable under section 9607 of this title. In any case where the claim has not been satisfied within sixty days of presentation in accordance with this subsection, the claimant may elect to commence an action in court against such owner, operator, guarantor, or other person or to present the claim to the Fund for payment.

42 U.S.C. § 9612.

Pointing to the underlined language, Reilly Tar argues that *all* claims, whether against the Fund or a private party, must be assertable against the Fund under section 111. 42 U.S.C. § 9611. It then turns to section 111(a), which provides in part:

> (a) The President shall use the money in the Fund for the following purposes:
>
> > (1) payment of governmental response costs incurred pursuant to section 9604 of this title, including costs incurred pursuant to the Intervention on the High Seas Act....

42 U.S.C. § 9611(a).

Reilly Tar then argues that section 111 provides for reimbursement of government response costs, "but only, 'government response costs incurred pursuant to section [104].'"[4] It then turns to section 104, arguing that certain requirements of that section have not been met. Specifically, it claims that the cooperative agreement called for by section 104(c)(3) has not been entered into. Section 104(c)(3) prohibits the President from taking "remedial"[5] actions under section 104 unless a cooperative agreement between the President and the affected state containing certain conditions has been entered into. 42 U.S.C. § 9604(c)(3). It provides:

> (3) The President shall not provide any remedial actions pursuant to this section unless the State in which the release occurs first enters into a contract or cooperative agreement with the President providing assurances deemed adequate by the President that (A) the State will assure all future maintenance of the removal and remedial actions provided for the expected life of such actions as determined by the President; (B) the State will assure the availability of a hazardous waste disposal facility acceptable to the

---

4. Section 111 does not limit recovery from the Fund to response costs incurred only under section 104. Section 111 itself lists numerous additional authorized purposes for the Fund. *See* 42 U.S.C. § 9611.

5. There are two types of response actions under CERCLA: removal actions and remedial actions. The Act provides extensive definitions

for each type of response action. 42 U.S.C. § 9601(23) and (24). Generally, removal actions are short term clean up actions while remedial actions contemplate a long term approach consistent with a permanent remedy. *Environmental Defense Fund v. Gorsuch,* Civ. No. 81–2083, slip op. at 2 (D.D.C. Feb. 12, 1982.)

President and in compliance with the requirements of subtitle C of the Solid Waste Disposal Act for any necessary offsite storage, destruction, treatment, or secure disposition of the hazardous substances; and (C) the State will pay or assure payment of (i) 10 per centum of the costs of the remedial action, including all future maintenance, or (ii) at least 50 per centum or such greater amount as the President may determine appropriate, taking into account the degree of responsibility of the State or political subdivision, of any sums expended in response to a release at a facility that was owned at the time of any disposal of hazardous substances therein by the State or a political subdivision thereof. The President shall grant the State a credit against the share of the costs for which it is responsible under this paragraph for any documented direct out-of-pocket non-Federal funds expended or obligated by the State or a political subdivision thereof after January 1, 1978, and before December 11, 1980, for cost-eligible response actions and claims for damages compensable under section 9611 of this title relating to the specific release in question: *Provided, however,* That in no event shall the amount of the credit granted exceed the total response costs relating to the release.

Reilly Tar's complex analysis of the Act is incorrect. Most importantly, Reilly Tar errs in attempting to link liability under section 107 to the authorized uses of the Fund provided in section 111. Liability under section 107(a) is independent of the authorized uses of the Fund under section 111 and of the cooperative agreement called for by section 104(c)(3).

In determining what conditions must be met before a party can be held liable for response costs under section 107(a), the obvious place to begin is with the language of section 107(a) itself. The first clause of that section provides:

*Notwithstanding any other provision or rule of law* and subject *only* to the de-

fenses set forth in subsection (b) of this section. . . .

42 U.S.C. § 9607(a) (emphasis added).

From this language it is apparent that Congress did not intend that courts engage in the complex inquiry and statutory tracing of the various sections Reilly Tar relied on. Section 107(a) was meant to stand by itself; liability under it can be determined without the numerous inquiries suggested by the defendant. The plain language of the statute says so. Liability for the specified response costs under section 107(a) is absolute, subject only to the defenses listed in section 107(b), which are acts of God, acts of war, and certain acts or omissions of third parties. 42 U.S.C. § 9607(b).

[20] There is no claim before the court seeking recovery from the Fund. The authorized uses of the Fund provided by section 111 are therefore not relevant to this action. Nor is there any suit before this court seeking to compel the President to enter into a cooperative agreement with Minnesota under section 104(c)(3). *See* 42 U.S.C. § 9604(c)(3). Whether there should be a cooperative agreement between the President and Minnesota as provided by section 104(c)(3) is not material in determining Reilly Tar's potential liability under section 107(a).

### Natural Resource Damages Claim.

The State of Minnesota has also asserted a claim for natural resources damages under section 107(a)(4)(C). 42 U.S.C. § 9607(a)(4)(C). Reilly Tar seeks dismissal of the natural resources damage claim on two grounds. First, it argues that the claim is premature because certain regulations and administrative procedures called for by the Act with respect to the assessment of natural resources damages have not yet been established. Specifically, Reilly Tar refers to section 301(c) of the Act, 42 U.S.C. § 9651(c), and sections 111(h) and (i), 42 U.S.C. § 9611(h) & (i).

Section 301(c) requires the President to promulgate regulations for the assessment of natural resources damages resulting from the release of hazardous substances. It states in part:

(c)(1) The President, acting through Federal officials designated by the National Contingency Plan published under section 9605 of this title, shall study and, not later than two years after December 11, 1980, shall promulgate regulations for the assessment of damages for injury to, destruction of, or loss of natural resources resulting from a release of oil or a hazardous substance for the purposes of this Act and section 1321(f)(4) and (5) of Title 33.

(2) Such regulations shall specify (A) standard procedures for simplified assessments requiring minimal field observation, including establishing measures of damages based on units of discharge or release or units of affected area, and (B) alternative protocols for conducting assessments in individual cases to determine the type and extent of short and long term injury, destruction, or loss. Such regulations shall identify the best available procedures to determine such damages, including both direct and indirect injury, destruction, or loss and shall take into consideration factors including, but not limited to, replacement value, use value, and ability of the ecosystem or resource to recover.

(3) Such regulations shall be reviewed and revised as appropriate every two years.

42 U.S.C. § 9651(c).

Section 111(h) provides that for purposes of the Act, federal officials designated by the President under the national contingency plan are to assess natural resources damages. 42 U.S.C. § 9611(h). Their assessment is given the evidentiary status of a rebuttable presumption on behalf of any claimant in any judicial or adjudicatory proceeding under the Act. *Id.* It provides:

(h)(1) In accordance with regulations promulgated under section 9651(c) of this title, damages for injury to, destruction of, or loss of natural resources resulting from a release of a hazardous substance, for the purposes of this Act and section 1321(f)(4) and (5) of Title 33, shall be assessed by Federal officials designated by the President under the national contingency plan published under section 9605 of this title, and such officials shall act for the President as trustee under this section and section 1321(f)(5) of Title 33.

(2) Any determination or assessment of damages for injury to, destruction of, or loss of natural resources for the purposes of this Act and section 1321(f)(4) and (5) of Title 33 shall have the force and effect of a rebuttable presumption on behalf of any claimant (including a trustee under section 9607 of this title or a Federal agency) in any judicial or adjudicatory administrative proceeding under this Act or section 1321 of Title 33.

*Id.*

 Dismissal is not appropriate even though the regulations required by Section 301(c) have not been promulgated and the assessment mechanism provided by Section 111(h) does not yet exist. Legislative history and other provisions of the statute support this conclusion.

The legislative history indicates that the provisions regarding promulgation of regulations and assessment by federal officials were intended to provide a standardized method for determining natural resource damages that would be efficient in both time and cost. The Senate Report states:

Investigations by the Committee on Environment and Public Works revealed the need for an improved, fair and expeditious mechanism for dealing with natural resource damages caused by releases of hazardous materials. The principal hindrance to attaining such a mechanism was the absence of a standardized system for assessing such damage which is efficient as to both time and cost.

S.Rep.No.848, 96th Cong., 2d Sess. 85.

Congress was aware of the difficulties plaintiffs faced in establishing damages to natural resources and sought to facilitate, not block, such claims through the regulation and assessment procedures of sections 301(c) and 111(h).

Furthermore, to interpret the Act as Reilly Tar suggests would, in effect, suspend the operation of section 107(a)(4)(C) until the regulations and assessment procedures are enacted. Congress did not intend to render the section imposing natural resources damages a nullity until then. Section 302 states that unless otherwise provided, all provisions of the act are effective on December 11, 1980. 42 U.S.C. § 9652. Congress could have said that no natural damages resource claims can be brought until sections 301(c) and 111(h) were fully implemented, but it did not do so.

The court is not unmindful of the practicalities of this litigation. Environmental litigation often lasts several years and it is certainly possible that the court will not be called upon to determine the ultimate merits of the State's natural resource damage claim until long after the regulations and assessment procedures are in place. A dismissal now would not serve a realistic purpose.[6]

Reilly Tar's final argument is that under section 107(f) the court should dismiss the State's claim to the extent that it seeks recovery for damages that occurred before the enactment of CERCLA. Section 107(f) provides in part:

> There shall be no recovery under the authority of subparagraph (C) of subsection (a) of this section where such damages and the release of a hazardous substance from which such damages resulted have occurred wholly before December 11, 1980.

42 U.S.C. § 9607(f).

Under section 107(f) Reilly Tar may escape liability for natural resource damages only where both the damages and the release occurred wholly before December 11, 1980. *Id.* Section 107(f) precludes liability under section 107(a)(4)(C) only where (1) all releases ended before December 11, 1980, and (2) no damages were suffered on or after December 11, 1980 as a result of the release. The complaint alleges continuing releases and damages from the release. The extent to which Reilly Tar will be entitled to escape liability under section 107(f) is a fact question to be resolved in future proceedings.

Accordingly, IT IS ORDERED that Reilly Tar's motions to dismiss are denied.

---

**6.** If a final determination on the State's natural resources damages claim is necessary before the full implementation of sections 301(c) and 111(h), the court would look to the criteria to govern the regulations under section 301(c) and existing case law to determine the appropriate amount of natural resources damages. *See, e.g., Commonwealth of Puerto Rico v. S.S. Zoe Colocotroni,* 628 F.2d 652 (1st Cir. 1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981); *State of Maine v. Tamano,* 357 F.Supp. 1097 (D.Me.1973).