**ORANGE ENVIRONMENT, INC. and Arthur E. Soons and Sandra Soons, Plaintiffs,**

**Hudson Riverkeeper Fund, Inc., Plaintiff–Intervenor,**

v.

**COUNTY OF ORANGE, Joseph G. Rampe, County Executive, and Orange County Department of Public Works, J. Daniel Bloomer, Commissioner, Defendants.**

No. 91 Civ. 8688(GLG).

United States District Court, S.D. New York.

Aug. 22, 1994.

Michael H. Sussman, Scott A. Thornton, Goshen, NY, Elizabeth Barbanes, Mt. Kisco, NY, for plaintiff Orange Environment.

Jeffrey P. Soons, Goshen, NY, for plaintiffs Arthur E. and Sandra Soons.

Leboeuf, Lamb, Greene & Macrae by Robert J. Alessi, Elise N. Zoli, Albany, NY, for defendants.

## OPINION

GOETTEL, District Judge.

This case involves the on-going efforts on the part of the state, environmental groups, and private plaintiffs to force a county landfill to comply with the federal environmental laws. The result has been a long and complicated battle fought on both legal and political fronts. From the outset, the county's effort to obey the environmental laws has been less than vigilant. Indeed, early on, the county showed a reprehensible lack of concern over the state's enforcement measures. However, it also appears that genuine efforts to address environmental concerns have been frustrated by political scuffles, the pressures of a mounting "garbage crisis," and the very real limitations of a landfill facility built without an engineered liner. In the face of the parties' inability to reach a practical technological solution, the legal battles continue.

The plaintiffs Orange Environment ("OEI") and Arthur E. and Sandra Soons filed this citizen suit pursuant to § 505(a) of the Clean Water Act ("the CWA"), 33 U.S.C. § 1365(a) and § 7002 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972 on December 31, 1991.

Defendants Orange County ("the County"), Joseph G. Rampe, County Executive, Orange County Department of Public Works, and J. Daniel Bloomer, Commissioner of the Department of Public Works, now move to dismiss several of plaintiff's claims for lack of jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1), or, in the alternative for summary judgment, pursuant to Fed.R.Civ.P. 56(c). Plaintiffs cross-move for summary judgment.

The crux of defendants' motion is their claim that, at the time plaintiffs filed this suit, the New York Department of Environmental Conservation ("DEC") was in the process of prosecuting an ongoing administrative action concerning the situation alleged in the complaint and that the DEC action divests this court of subject-matter jurisdiction. They also argue that DEC action and New York law supersede certain of plaintiffs' RCRA claims and that the pendent state claims should be dismissed.

After careful consideration of the applicable law and facts, we deny the parties' cross-motions for summary judgment and grant in part and deny in part defendants' motion to dismiss.

## FACTS

### A. Procedural Background

On October 18, 1991, OEI served the County, the United States Environmental Protection Agency ("EPA"), and the DEC with a notice of intent to bring suit. On December 30, 1991, plaintiffs filed this lawsuit, pursuant to the citizen suits provisions in the CWA, 33 U.S.C. § 1365(a), and RCRA, 42 U.S.C. § 6972(a)(1)(A) and (B). The complaint alleged, *inter alia*, that defendants violated the CWA by discharging pollutants, including landfill leachate,[1] into the Wallkill River and Cheechunk Canal without a required permit. 33 U.S.C. § 1311(a), 1342.

In addition, the plaintiffs brought a citizen suit under a RCRA provision authorizing a civil action where the defendant is "alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter." 42 U.S.C. § 6972(a)(1)(A). Specifically, plaintiffs alleged that the defendants violated RCRA's permitting requirements, *id.*, § 6925(a), and open dumping provisions, *id.*, §§ 6944, 6945. They also alleged that a citizen suit was proper because the landfill's continued release of hazardous pollutants represented an imminent and substantial endangerment to health and the environment in violation of 42 U.S.C.

---

1. "Leachate" has been defined as "[a]n aqueous liquid that contains soluble or suspended matter acquired as the water percolates through solid waste, soil, underlying mineral strata, or other materials." *New Castle County v. Hartford Accident and Indemnity Co.*, 933 F.2d 1162, 1167, n.

5 (3rd Cir.1991), *quoting*, 2 International Dictionary of Medicine and Biology 1533 (1986). The water producing the leachate can be the result of the moisture originally contained in garbage, precipitation, groundwater, or any combination of the three.

§ 6972(a)(1)(B). Finally, the Soons alleged various state common law claims.

On February 18, 1992, defendants moved to dismiss all the Soons' claims. We denied defendants' motion by bench decision on March 6, 1992. On July 31, 1992, we granted the Hudson Riverkeeper Fund, Inc.'s ("the Riverkeeper") motion for leave to intervene.

In the meantime, the County was seeking to expand the landfill into land which contained federally protected wetlands. In July of 1992, the County and the EPA entered into a CWA § 309(a), 33 U.S.C. § 1319(a), compliance order in which the County admitted to filling federal wetlands without a permit as part of its landfill expansion plan. The order allowed phased use of the landfill expansion area in exchange for off-site restoration of wetlands.

In response to the order, OEI moved for a preliminary injunction, pursuant to Fed. R.Civ.P. 65, to prohibit resumption of construction of the landfill expansion. On September 15, 1992, we consolidated the preliminary injunction hearing with the hearing on the requested permanent injunction and wetlands restoration.

On December 4, 1992, plaintiffs and plaintiff-intervenor moved for partial summary judgment on the issue of whether the EPA compliance order obviated the County's need to get a § 404 permit to fill the wetlands from the Army Corps of Engineers as required by the CWA, 33 U.S.C. § 1344. Defendants cross-moved for summary judgment on the issue.

On January 20, 1993, we granted plaintiff and plaintiff-intervenor's motion for partial summary judgment and held that the defendants were required to obtain a § 404 permit despite the EPA compliance order. *See Orange Environment, Inc. v. County of Orange,* 811 F.Supp. 926 (S.D.N.Y.1993). Because our decision effectively enjoined the defendants from further expansion of the site until they received a § 404 permit, we dismissed OEI's motion for preliminary injunction without prejudice.

Soon thereafter, then County Executive Mary McPhillips announced her desire to abandon the expansion project and commenced settlement negotiations. However, in February of 1993, the County Legislature moved to intervene as a separate party defendant in order to appeal the January 20 decision. We denied the Legislature's intervention motion. *See Orange Environment, Inc. v. County of Orange,* 817 F.Supp. 1051 (S.D.N.Y.1993). The Legislature appealed, and our decision was affirmed. *See Orange Environment v. Orange County Legislature,* 2 F.3d 1235 (2d Cir.1993).

Despite, the Legislature's unsuccessful appeal, it succeed in delaying the settlement negotiations until McPhillips was voted out of office. Her successor, Joseph Rampe has decided to continue litigation rather than settle this case.

Defendants now move to dismiss plaintiffs' remaining claims under the CWA and RCRA pursuant to Fed.R.Civ.P. 12(b)(1) or, in the alternative, for summary judgment pursuant to Fed.R.Civ.P. 56(c).[2] Their motion does not address plaintiffs' claims relating to the issue of the § 404 permit under the CWA and only asserts that plaintiff's claims grounded upon the discharge of leachate from the existing landfill should be dismissed. Plaintiffs oppose and cross-move for summary judgment. They seek (1) a determination pursuant to Fed.R.Civ.P. 56(d) of defendants' liability for violation of the CWA and RCRA, (2) declaratory judgment that defendants have violated the CWA and the open dumping and imminent and substantial endangerment provisions of RCRA, 42 U.S.C. §§ 6945, 6972; 40 C.F.R. Part 257, and (3) a permanent injunction directing the defendants to cease from further violations of RCRA or the CWA.

## B. Landfill Background

The crux of defendants' motion is that the State's pre-existing, ongoing administrative actions with respect to the violations at issue in the complaint operate as a jurisdictional bar to plaintiffs' citizen suit. In order to

---

**2.** Defendants originally moved to dismiss or for summary judgment as to intervenor, the Hudson Riverkeeper Fund. However, defendants and intervenor have entered into a settlement agreement rendering defendants' motion moot as to the Riverkeeper.

properly assess defendants' claims we must, unfortunately, delve into the depths of the landfill and its history.

### 1. *The Landfill Site*

The Orange County Landfill is located on approximately 301 acres in the Town of Goshen, Orange County, New York in the Wallkill River Valley. The landfill is surrounded on three sides by various parts of the Wallkill River. Further south, the Wallkill flows into the Hudson River.

The Cheechunk Canal carries the major portion of the Wallkill's flow past the landfill on its southeast side. The original riverbed of the Wallkill, or the Old Channel, flows along the landfill's south and northwest sides.

When the County built the original landfill, it did not construct a liner to prevent contamination from entering groundwater below the site or surface water adjacent to the site. However, a good portion of the landfill site lies over a layer of clay and silt which naturally occurs in the ground. Because fine grained deposits do not transmit fluids easily, naturally occurring clays underneath a landfill can retard the downward migration of leachate. Unfortunately, the clay/silt layer beneath the landfill is not of uniform depth or composition. In areas where the layer is absent, sand from a layer of sand and gravel underneath the clay/silt layer appears at the ground's surface. In addition, pockets of sand, which may range from 0 to 15 feet, are found within the clay/silt layer.

The significance of coarser deposits, such as sand and gravel, is that they may become saturated with fluid. Indeed, a portion of the sand/gravel layer below the landfill is saturated with water and constitutes part of the Southern Wallkill Valley Aquifer. "Windows" occur in areas where the clay/silt unit is absent and sand appears at the ground's surface. Windows below the landfill can provide a pathway for leachate to enter the aquifer.

Underneath the sand/gravel layer is a layer of bedrock. While the bedrock unit is generally composed of solid rock, it often contains fractures through which water can move. Domestic wells in the area surrounding the landfill tap the bedrock for water. Thus, sand deposits within the silt/clay unit can serve as conduits for contaminant migration away from a landfill down into ground water contained in bedrock fractures or sideways to surface waters contained in riverbeds.

Other possible leachate pathways are contained in dolostone, a carbonate rock which occurs in bedrock. Interconnected pore spaces appear in dolostone which transmit water. Carbonate bedrock occurs at relatively shallow depth increasing the opportunity for contamination.[3]

### 2. *Landfill History*

On July 6, 1973, the County submitted plans for the landfill to the DEC which called for three separate landfill areas on the property to occupy a total of 245 acres. The DEC issued a permit to begin construction on May 23, 1974, and operation began in the landfill area nearest to the Cheechunk Canal ("Fill Area 1") on September 30, 1974.

The County operated the landfill from 1974 to January 1992. During that time period, approximately seven million cubic yards of predominately municipal waste was deposited on a 75–acre portion of the property.

Leachate was first detected in 1975 when the DEC recorded two observations of leachate at the landfill.[4] Subsequent DEC re-

---

**3.** Of course, in addition to underground pathways, leachate can percolate off the surface of the landfill and off-site by surface pathways.

**4.** According to Dr. Michael Lane, a geologist with expertise in solid waste management retained by the plaintiffs, leachate at the landfill can move along several pathways. First, precipitation that runs off the landfill can pick up contamination through a thin or breached cap. Second, leachate within the landfill can move laterally to break out along the sides of the landfill. Such break outs are called leachate seeps. Finally, leachate within the landfill may percolate downward and enter the soil and rock layers directly beneath the landfill. Once in the soil and rock layers, the movement of the leachate is determined by the specific site hydrology and geology.

Lane states that the surface water run off leachate is generally of a lower strength than the undiluted leachate generated within the waste mass.

ports show that leachate was also observed in 1976 and 1977 with one recorded instance of leachate entering a water course in 1976 and two in 1977.

In 1976, monitoring wells around the landfill exhibited signs of groundwater contamination by iron, phenols and sulfates. While the engineer's report noted that "the groundwater quality in the area is not that good," it suggested that "something may be affecting the groundwater adjacent to monitoring well # 3."

In 1980–81, DEC monitors visited the site and issued seven reports, five of which recorded leachate discharges into the Wallkill and six of which recorded uncontrolled leachate at the site.

In 1981, the DEC issued the County an operating permit until August 1983 under the new state landfill regulations. In addition to compliance with state regulations, the permit included twelve special conditions. Two conditions involved leachate. The permit required "[i]f leachate is generated in a an appreciable volume, a State Pollutant Discharge Elimination System Permit ("SPDES"), pursuant to Environmental Conservation Law, Article 17, Title 8, shall be required prior to its disposal in any manner other than spray irrigation."

It also stated that "[t]he Permittee shall design a perimeter leachate collection system acceptable to the Department. This system shall be implemented when a significant amount of leachate is generated at the site as determined by the Department. This shall be submitted to the Department by January 1, 1982."

On August 22, 1983 (ten days after its permit expired), the County asked the DEC to extend its permit which was done without public discussion or participation.

By the spring of 1986, the County still had not submitted a leachate management design. On April 16, 1986, a DEC engineer wrote a letter to the County's Commissioner of Public Works informing him that "the lagoons in the Orange County Sanitary which have been used to store leachate, [were] very near their capacity." In the face of DEC penalties, she suggested that the County take steps to alleviate the situation immediately such as arranging to haul the leachate off-site. Enclosed with the letter was a permit application to transport the leachate off-site.[5]

In 1986, the DEC issued 10 site reports, all of which recorded uncontrolled leachate on or near the site, but only one of which recorded leachate entering the surface waters.

### a. 1986 Consent Order

On December 31, 1986, the County and the DEC executed a consent order relating to the County's unpermitted use of the landfill since the permit expired on June 30, 1984. The order also contained DEC allegations that the County had violated New York regulations and its original operating permit by allowing leachate to drain or discharge into surface waters without an SPDES permit and that it had failed to comply with special permit conditions requiring it to carry out a groundwater monitoring program and submit design plans for a perimeter leachate collection system.

Although the 1986 Order recited the E.C.L.'s penalty provisions, no penalties were assessed against the County. Instead, the order required that the County submit a lifespan determination report, sub-surface investigation report, and a proposal for interim leachate removal and disposal. The order provided that the interim leachate management proposal would be in effect "until such time as a permanent leachate management

5. In April of 1988, the DEC wrote to the County to complain that leachate was discharging directly from the storage lagoon into the Wallkill. The DEC wrote, "since the permit application materials have been in your hands for some two years, submission of this application should be something that the County can accomplish very quickly." The letter suggested that the County was "taking advantage of [the DEC's] good will by allowing operation of the site to degrade into a condition of serious non-compliance while [a permit hearing for site expansion] was in progress." Perhaps in response to the DEC's reservation of its right to suspend the expansion hearing process in light of the violations, the County submitted an application to transport the leachate to the Newburgh Treatment Plant which was approved that same month.

system [was] in operation." However, the order did not provide that a permanent management system be in operation by a specified time.[6]

The order also provided that an intermediate cover be installed over all surfaces where no additional waste would be deposited no later than 60 days after its effective date. It further required that the County submit a final closure plan no later than 120 days after the DEC approved the subsurface report.

After obtaining extensions of its compliance deadlines, the County submitted an interim leachate management plan in February of 1987 which was revised and resubmitted in April of that year at DEC's request. The DEC approved it, subject to some modification on May 16, 1987.

The installation of the interim leachate collection system began in June of 1987, and its eastern side was complete by the summer of 1988.

In November of 1987, the DEC filed an enforcement complaint against the County for violation of operating conditions at the landfill.

The problems cited in the 1987 complaint had not been cleared up by early 1989, and on February 23, 1989, Paul Keller, Regional Director of the DEC sent a letter to the County stating he was "shocked to hear that leachate has again been observed discharging into the Wallkill River." The letter chastised the County for its failure to fully implement the interim leachate management plan despite many reminders from the DEC. Keller wrote that the County's assertions that it was not dealing with the leachate because it was awaiting DEC approval was false and "reflects a cavalier attitude which [was] extremely troubling."

Keller warned that the County's "persistent failure to control the leachate" on its existing landfill jeopardized its application for an expansion permit. He also denied the County's request to increase the height of the current elevation and recommended prompt further study of possible subsurface

movement between the landfill and Wallkill riverbank.

### b. *Landfill expansion*

In the meantime, the DEC was also considering the County's permit application for a landfill expansion. The County first submitted an expansion application in 1984. Despite the County's contention that it was entitled to landfill on the unused portion of the 300 acre parcel under the original 1974 permit, the DEC disagreed. It also maintained that the expansion was not "grandfathered" out of the state environmental impact review requirement. OEI participated in the permitting process as a party in interest and submitted a letter setting forth its concerns as early as 1984.

In 1987, the County applied for a permit to construct a 154-acre landfill expansion. A mandatory public hearing was held on issues relating to the extension application beginning on November 18, 1987. Although the hearing was originally consolidated with the pending enforcement action, the enforcement action was adjourned at the DEC's request. The application was denied by the Commissioner of the DEC due to possible danger to the Southern Wallkill Valley aquifer and because inadequate consideration was given to alternative sites.

The County then submitted a revised application for a smaller, 75 acre expansion. The DEC approved the revised application in December of 1988.

In July of 1989, DEC issued permits for the construction and operation of the expansion. The construction permit created the Orange County Sanitary Landfill Interested Persons Board as a "continuing forum for communication between the Permittee and interested public." It also required that the County fund an Environmental Monitor for the existing facility as well as the new expansion. Finally, the permits required that the County comply with the 1986 Order as well as a second Consent Order entered into in 1989.

---

**6.** Defendants assert that a permanent leachate collection system could not be installed until the

landfill ceased operations and a cap was installed.

Sometime during the construction of the landfill, OEI notified the EPA that the landfill expansion was being built on federally protected wetlands. In late 1991, this action was commenced. In January 1992, the County ceased construction of the expansion and hired a consultant to investigate the landfill site.

In February 1992, the EPA notified the County that it was investigating the possible unpermitted filling of wetlands at the landfill expansion. Following negotiations, the EPA and the County entered into a Compliance Order in July 1992. On January 20, 1993, we granted the plaintiffs' motion for partial summary judgment and held that, despite the EPA Compliance Order, the County still had a duty to obtain a § 404 permit from the Army Corps of Engineers before commencing operations at the landfill expansion site. 33 U.S.C. § 1344.

The County's application is currently pending before the Army Corps of Engineers.

### c. 1989 Consent Order

Meanwhile, the County and the DEC entered into a second Consent Order on July 7, 1989 concerning the violations at the existing landfill. The 1989 Order alleged five violations of the 1986 Consent Order, including failure to implement the revised leachate management plan and failure to meet the deadline for placement of an intermediate cover over the site despite the DEC's grant of two extensions. (The intermediate cover was completed in July of 1987.) The Order also alleged several violations of the New York regulations governing landfills, including extension of the landfill without placement of a liner or the installation of a leachate collection and storage system and drainage of leachate into the Wallkill River without an SPDES permit. The County admitted to violation of the 1986 Order and to drainage of leachate without a permit.

As consideration for the DEC's withdrawal of its complaint, the County agreed to spend $300,000 in the acquisition of real property for an Environmental Credit Project. The DEC also assessed a $375,000 civil penalty

against the County, $300,000 of which was suspended so long as the County complied with the Environmental Credit Project. The Order also included a stipulated penalty provision in which the County agreed to pay a $25,000 fine for any future unpermitted discharges of leachate into the Wallkill River or Cheechunk Canal. Finally, the Order required that the County carry out a bank stability analysis and gave DEC monitors access to the facility in order to inspect the site to ensure compliance with the order.

From March 1990 to September 1991, DEC monitor William Myers was on-site three days a week and filled out a weekly monitoring report. In 1990, Myers identified 19 instances of leachate discharge into surface waters. However, no penalties were assessed against the County. Also in 1990, part of the existing leachate collection system on the eastern side of the site collapsed.[7]

In 1991, the DEC monitor identified 6 instances of leachate discharge into surface waters. It also found 64 violations for uncontrolled leachate on or near the site and for failure to minimize leachate and prevent its discharge into surface waters. These violations probably occurred in part due to the problems with the leachate collection system. The DEC issued seven stipulated penalties pursuant to the 1989 Order for the discharges into surface water.

On November 1, 1991, two weeks after OEI issued a notice of intent to bring suit, DEC's Regional Director wrote that "neither the existing landfill closure, nor the completion of the expansion area has progressed satisfactorily." Because "sufficient evidence existed to commence enforcement action," the Director informed the County that it would soon present the County with a draft Consent Order to resolve the violations. Finally, the letter stated that the existing landfill could not be operated after December 31, 1991.

### d. 1992 Consent Order

On January 15, 1992, the County and the DEC entered into a third consent order. The order recited unpermitted discharges of

---

7. To date, the collection system still does not completely surround the landfill.

leachate in nine separate locations and vertical expansion of the landfill in violation of the 1986 Order. It also found that the landfill violated state regulations since January 1, 1991 for failure to confine blowing paper and litter and because of cracks, erosions and depressions in its intermediate cover.

The order required that the County undertake an Environmental Credit Project which valued at least $75,000. It assessed $100,000 in civil penalties, but $75,000 was suspended so long as the County complied with the credit program. The order allowed the landfill to accept solid waste until January 1992 and required that it submit a closure plan as required by the 1986 Order although no deadline was set.[8]

Despite the fact that the landfill ceased to accept waste for disposal in January of 1992, the DEC report for that year documented 31 violations for failure to minimize leachate through drainage control. On October 23, 1992, the DEC sent a letter to the County assessing $25,000 of the suspended $75,000 penalty due to violations of the 1992 Order (leachate was observed flowing into the Wallkill River on four occasions in September and October of 1992). As of December 1993, no project had been approved for the Environmental Credit Program.

### e. *Classification as a hazardous waste site*

Meanwhile in April of 1992, the DEC classified the landfill as a class 2 inactive hazardous waste site. As a result of the classification, jurisdiction over the landfill closure was transferred from the DEC's Division of Solid Waste to its Division of Hazardous Waste Remediation. While the new classification required that additional studies be performed, it also made state remediation funds available. *See* N.Y. E.C.L. § 27–1301 *et seq.*[9]

The DEC recognized the possibility that hazardous waste was present at the site at least as early as 1983 when it classified the landfill as a Class 2a inactive hazardous waste site. The classification indicated that the DEC suspected that hazardous waste had been disposed at the site and that further information was necessary.[10]

Pursuant to final classification, Gibbs & Hill, Inc. prepared a Phase I Hazardous Waste Site Investigation for the DEC in 1988. The Phase I study consisted of the compilation of existing information, a site inspection, and a review of monitoring data. Gibbs & Hill did not recommend a Phase II study, which generally involves site specific investigations and data collection, and no Phase II study was performed.

By March of 1992, the landfill still retained its temporary 2a classification, and the County's consulting engineers, C & S Engineers, suggested that the County contact the DEC to inquire as to the status of the review since the final classification of the landfill would have important implications on the reimbursement of closure investigation costs. Perhaps at the County's prodding, the DEC reclassified the site a month later.

Although New York state recognizes the landfill as an inactive hazardous waste site, it is not included on the EPA's National Priorities List. Indeed, according to CERCLIS, a database maintained by the EPA which "supports and tracks the EPA's site planning and tracking functions" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the only actions undertaken by the EPA at the landfill were a

---

8. The landfill closure was triggered by the life span determination prepared by the County and submitted to the DEC in 1987 pursuant to the 1986 Consent Order. The life span determination stipulated a maximum elevation for the landfill. The maximum elevation was reached in 1990 and triggered the eventual closure of the landfill in 1992.

9. Since CERCLA bars requiring any person "to contribute to any fund, the purpose of which is to pay compensation for claims" covered by CERCLA, 42 U.S.C. § 9614(c), New York law expressly

states that the Hazardous Waste Remedial Fund may not provide reimbursement for costs covered by CERCLA. *See* L.1982, Ch. 857, § 19, reprinted following State Finance Law § 97–b.

10. The 1991 Annual Report for Inactive Hazardous Waste Disposal Sites in New York State prepared by the DEC's Division of Hazardous Waste Remediation defines the 2a classification as a "temporary classification ... assigned to sites where there is inadequate data to assign them to the five classifications specified by law."

preliminary site assessment in 1980 and a site screening inspection in 1991. No further EPA studies were done, and the landfill is not listed on the EPA's proposed or final National Priorities List of uncontrolled hazardous substances releases that are designated as priorities for long term remedial evaluation and response.

f. *Current status*

In January of 1993 a fourth Consent Order was entered into which requires that the County implement a full inactive hazardous waste disposal site remediation program and allows up to 75 percent reimbursement from the state.

Perimeter leachate collection systems are in place along the northwestern, western and southwestern sides of the landfill. The collection systems are comprised of a buried perforated collection pipe and a runoff collection trench. The trench drains into a collection pond located in the southeastern corner of the site, and the leachate from the underground pipes is collected in storage tanks. The runoff from the collection pond and the leachate from the tanks are transported to the Newburgh sewage treatment plant. The County collects and treats approximately 1.8 million gallons of leachate per month.

Despite the collection system, the 1993 DEC report documents 9 violations for leachate entering surface water, 13 violations for leachate outbreaks on side-slopes, and 21 instances of failure to minimize leachate through drainage control.

A remedial investigation and feasibility study ("RI/FS") [11] is currently underway at the landfill, and a work plan has been approved by the DEC (work plans usually provide an evaluation of existing data and background information collected prior to an

RI/FS and overview of the steps to be taken during the process).

Because the RI/FS process may be quite lengthy, the County and the DEC have agreed to undertake an accelerated remedial action ("ARA") program. In a record of decision issued in January of 1994 ("ROD"), the DEC explained when an ARA program might be necessary. It stated

when the major source of contamination is clearly evident, the strategy for the remedial program is to conduct an early evaluation of actions that will quickly control the source of contamination. In this way, the NYDEC seeks to accelerate the remedial process by separately, designing and implementing a portion of the remedial action to address the threat. At the same time, an RI/FS will be completed to ensure that an effective overall remedy is chosen for the site.

Pursuant to the ARA program, the DEC created a proposed remedial action plan which was presented at a public meeting on October 28, 1993 and conducted a focused feasibility study in order to examine proposed remedial alternatives.

The remedy chosen by the DEC in the ROD is early capping pursuant to state specifications contained at 6 N.Y.C.R.R. Part 360.[12] According to the ROD, the cap should prevent future SPDES violations and significantly reduce leachate generation.

In April of 1994, the County's environmental engineers prepared an "Interim Leachate and Stormwater Runoff Control Plan" which was designed to reduce or control landfill leachate and contaminated runoff prior to the completion of accelerated remedial action in accordance to the ROD. Prior to construction of the cap, the plan provides for the

---

11. RI/FS investigations are composed of two parts. First, a remedial investigation takes place in order to determine the extent and type of contamination at the site and to assess the threat any contamination poses on the environment and public health. Then, a feasibility study takes place in order to evaluate the possible remedial alternatives and the selected remedial action is recommended. After review and public comment, the DEC usually issues a proposed remedial action plan and a record of decision which documents the final remedy selection.

12. The ROD opted for the "Part 360 Cap" over a "RCRA Cap" despite the RCRA Cap's slightly higher efficiency for preventing rainwater from entering the landfill because the RCRA Cap is more expensive and required a longer construction time and the utilization of a greater volume of material. In addition the RCRA Cap posed a higher risk of tensile failure and cannot withstand as much subsidence.

collection of surface leachate outbreaks, the repair of eroded areas, and the installation of leachate seep drains.

Plaintiffs and defendants' experts dispute whether or not the efforts undertaken by the DEC and the County will adequately address the leachate problem.

ANALYSIS

A. The Clean Water Act

■ Defendants argue that plaintiffs' citizen suit under the CWA must be dismissed due to the DEC's diligent prosecution of an administrative action. Plaintiffs assert that (1) the CWA's preclusion provisions do not apply because the DEC's actions cannot properly be characterized as diligent, and (2) even if the preclusion provisions apply, their suit is only barred to the extent that it seeks civil penalties.

To the extent that plaintiffs' citizen suit is not precluded, the defendants argue that it is moot in light of the current efforts the County has undertaken to control the leachate problem. Plaintiffs have also cross-moved for summary judgment.

1. *Applicability of Section 1319(g)(6)*

In 1987, Congress amended the Clean Water Act and added, *inter alia,* an "Administrative penalties" subsection to the CWA's Enforcement section. In addition to giving the Administrator and Secretary of the Army, in consultation with the State in which a violation occurs, the power to impose administrative penalties, the subsection also provided that action undertaken by the EPA Administrator or Secretary

> under this subsection shall not affect or limit the Administrator's or Secretary's authority to enforce any provision of this chapter; except that any violation— ...
>
>> (ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection ...
>
> shall not be subject to a civil penalty action under subsection (d) of this section or sec-

tion 1321(b) of this title or section 1365 of this title.

33 U.S.C. § 1319(g)(6)(A). Thus, the amendment precludes a citizen suit where a state is diligently prosecuting an administrative penalty enforcement action.

The CWA's preclusion provision further provides:

> The limitations contained in subparagraph (A) on civil penalty actions under section 1365 of this title shall not apply with respect to any violation which—
>
>> (i) a civil action under section 1365(a)(1) of this title has been filed prior to the commencement of an action under this subsection, or
>>
>> (ii) notice of an alleged violation of section 1365(a)(1) of this title has been given in accordance with section 1365(b)(1)(A) of this title prior to commencement of an action under this subsection and an action under section 1365(a)(1) of this title with respect to such alleged violation is filed before the 120th day after the date on which such notice is given.

*Id.* at § 1319(g)(6)(B).

a. *Prosecution under a comparable state law*

i. DEC action

Section 1319(g)(6)(A)'s limitation on citizen suits requires state prosecution of the violation under a comparable state law. In this instance, the comparable state provisions would be New York's Water Pollution Control law, Article 17 of the E.C.L. and the penalty provisions contained at Title 19 of Article 71.

While the DEC's enforcement efforts prior to October of 1991 [13] focused on regulating the landfill as a solid waste management facility under Title 7 of Article 27 of the E.C.L., it is clear that the DEC was aware of leachate at the landfill and that part of its enforcement efforts were targeted directly at the leachate problem. Indeed, New York regulations governing solid waste facilities

---

**13.** Although the County and the DEC appear to have stepped up their efforts at the landfill site, we must confine our inquiry to the DEC's actions prior to the plaintiff's filing of their notice of intent in October of 1991.

specifically prohibit the discharge of leachate into surface waters without an SPDES permit, 6 N.Y.C.R.R. § 360.8(a)(3), and it is clear that the DEC was concerned with the County's noncompliance with part 360.8(a)(3).

Further it appears that by 1989, the DEC was acting under its authority over both the Article 27 and Article 17. Indeed, a consent order entered into by the parties in 1989 specifically includes a charge and admission by the County that leachate discharges into the Wallkill constituted a violation of N.Y. E.C.L. §§ 17–0501, 17–0701, 17–0803, and 17–0807. Thus, while the DEC may not have originally conceptualized its activities at the landfill as an enforcement action under Article 17, it appears that the water pollution issue was a major component of the action at its inception and that enforcement of Article 17 had become a major purpose for DEC action by 1989.

### ii. Comparable statute

Defendants argue that the New York law and regulations concerning water pollution are essentially similar to the federal scheme. N.Y. E.C.L. § 71–1929(1) provides for the imposition of civil penalties for violation of or failure to perform a duty under the state water pollution control statute, including state permitting requirements. Although the statute technically provides that the penalties shall be recoverable in an action brought by the Attorney General, *id.* at § 71–1929(3), penalties may also be assessed by the Commissioner in the first instance which are subject to review in an Article 78 proceeding. *See In the Matter of DVC Indust., Inc. v. Flacke,* 86 A.D.2d 892, 447 N.Y.S.2d 523 (2d Dep't 1982). We recognized that § 71–1929 was comparable to the CWA's administrative penalty provisions contained at 33 U.S.C. § 1319(g) in *New York Coastal Fishermen's Ass'n v. New York Dep't of Sanitation,* 772 F.Supp. 162, 165 (S.D.N.Y.1991) ("*NYCFA* "). Because we see no reason to depart from that holding, we proceed to the issue of whether or not the DEC's actions constitute diligent prosecution.

### b. *Diligent prosecution*
#### i. The DEC's enforcement efforts

When the DEC issued the landfill's second permit in 1981, its monitors had already recorded leachate discharges into the Wallkill as well as uncontrolled leachate on-site. As a result, it conditioned the 1981 permit on the County's submission of a perimeter leachate collection system design by January of 1982. The permit stated that the system would be implemented after a "significant amount of leachate [was] generated at the site."

In the spring of 1986, the DEC was aware that the lagoons used to store leachate were near capacity and that the County had failed to even submit a perimeter collection system design. As a stop gap measure, the DEC suggested that the County arrange to haul the leachate off-site for treatment. However, the County failed to take action to deal with the leachate.

On December 31, 1986, almost five years after the County's original deadline to submit a leachate collection system to the DEC had passed, the County and DEC entered into a consent order which gave the County thirty additional days to submit a proposal for leachate removal and disposal. Although the DEC stated that the leachate discharges into surface waters were in violation of state permitting requirements, it did not assess any penalties.

In November of 1987, the DEC filed another enforcement complaint for the County's violation of its operating permit including, *inter alia,* leachate discharges into the Wallkill without an SPDES permit and delay in the implementation of the revised leachate management plan. In the spring of 1988, the DEC noted that leachate was discharging directly from storage lagoons into the Wallkill River and chastised the County for failing to submit an application to treat the leachate off-site despite its receipt of the application materials two years prior.

In February of 1989, the DEC wrote a second time to complain that leachate was again observed discharging into the Wallkill despite the partial construction of the perimeter collection system and the approval of the permit to haul leachate off-site.

In July of 1989, the County and the DEC entered into a second consent order in which

the County admitted allowing leachate from the facility to drain or discharge into the Wallkill without an SPDES permit. With respect to the leachate discharges and other violations of the landfill permit conditions and New York law regulating waste management and mineral resources, the DEC assessed a $375,000 penalty against the County, but waived $300,000 which was to be applied towards an environmental credit project. The County also stipulated that it would pay a $25,000 penalty per occurrence of any future unpermitted discharges.

Despite a provision in the order requiring that the County give DEC monitors access to the landfill to ensure compliance with the order, there are no records of a DEC monitor until March of 1990. In 1990, the DEC monitor identified 19 instances of leachate discharge into the surface waters but no penalties were assessed against the County.

In 1991, the monitor reported six instances of leachate discharge into surface waters as well as 64 violations for uncontrolled leachate on or near the site and for failure to minimize leachate and prevent its discharge into surface waters. While these violations were probably due in part to the collapse of a portion of the existing leachate collection system in 1990, the DEC did issue some stipulated penalties.

On November 1, 1991, two weeks *after* OEI issued a notice of intent to bring suit the DEC informed the County that it was commencing a new enforcement proceeding.

### ii. Applicable case law

Defendants argue that state agencies are entitled to "considerable latitude" in their enforcement efforts. They claim this standard is supported both by case law and by the CWA itself. The First Circuit has written "[w]here an agency has specifically addressed the concerns of an analogous citizen's suit, deference to the agency's plan of attack should be particularly favored." *North & South Rivers Watershed Ass'n, Inc. v. Scituate,* 949 F.2d 552, 557 (1st Cir.1991). The District Court of Connecticut similarly held that plaintiffs who assert that a state prosecution is not diligent bear a heavy burden. *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.,* 777 F.Supp.

173, 183 (D.Conn.1991), *aff'd in part and rev'd in part,* 989 F.2d 1305 (2d Cir.1993). It held, "[t]he court must presume the diligence of the State's prosecution of a defendant absent persuasive evidence that the State has engaged in a pattern of conduct in its prosecution of the defendant that could be considered dilatory, collusive or otherwise in bad faith." *Id.* at 183.

Defendants argue that the language of the CWA supports granting wide discretion to the state. The statute states that it is Congress' policy and goal "to recognize, preserve, and protect the primary responsibilities and rights of the States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources ..." 33 U.S.C. § 1251(b).

We considered the issue of diligent prosecution in *NYCFA, supra.* In that case, we noted that the "main purpose behind that limitation of citizen suits is to permit the federal and state governments to exercise their powers to remedy violations of the Clean Water Act" and that "a citizen suit may not 'seek to recover fines and penalties that the government has elected to forgo.'" *Id.* at 165, *quoting, Atlantic States Legal Found. v. Eastman Kodak Co.,* 933 F.2d 124, 127 (2d Cir.1991). Thus, we declined to interpret section 1319(g)(6)(A) to require the actual imposition of penalties before a citizen suit could be precluded because "[s]uch an interpretation would unnecessarily undermine state and local enforcement efforts." *NYCFA,* 772 F.Supp. at 165.

Plaintiffs argue that DEC's actions in this case do not constitute diligent prosecution. They argue that the DEC was aware of leachate discharge as early as 1975, and, despite the DEC's on-site monitor, violations still continue. They contend that the DEC has allowed the County to buy its way out of compliance by Environmental Credit Projects. Although violations were cited and fines were threatened, they were seldom levied. When the DEC did assess fines, they were usually waived.

Defendants maintain that the DEC was diligently addressing the leachate problem

since 1986 and that despite a failure to levy significant fines, the DEC's involvement has been steadily increasing.[14] They argue that the landfill was originally constructed without a liner at a time when leachate outbreaks were the norm. As such, they contend that the DEC sought to focus its efforts on insuring that the County took appropriate measures to alleviate the leachate problem rather than assessing heavy fines. They argue that it was permissible for the DEC to opt to "bridge the County" into compliance with the CWA rather than adopting a punitive stance.

■ We note that the relevant inquiry for defendants' motion to dismiss is not whether or not the DEC's actions can currently be categorized as diligent, but whether or not they could be so categorized in late 1991. However, we also note that the standard for evaluating the diligence of the state in enforcing its action is a low one which requires due deference to the state's plan of attack and that part of the DEC's difficulty in the earlier stages of its enforcement efforts was caused by the recalcitrant and cavalier attitude adopted by the County. Indeed, it appears that the problem was not that the DEC was turning a blind eye to the County's violation, but that the county consistently failed to comply with the terms of the Consent Orders.

Because we think that the DEC's actions and enforcement decisions are entitled to a good degree of deference, we find that § 1319(g)(6)(A) precludes a civil penalty action under the citizen suit provisions of the CWA.

### 2. Scope of Section 1319(g)(6)

■ Defendants argue that if § 1319(g)'s requirements for preclusion are satisfied, it bars a citizen suit in its entirety. They claim that the section's bar to a "civil penalty action ... under section 1365" incorporates all actions which arise under the CWA's citizen suit provisions, including those seeking injunctive relief and that the word "action" is "a collective noun, *inclusive* of all claims for

relief." In support of its position, it cites the First Circuit's decision in *Scituate*.

The *Scituate* court based its interpretation of § 1319(g) on the language contained in § 1365 which does not distinguish between civil penalty actions and other civil actions. Section 1365 simply provides:

> (a) Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf—
> (1) against any person ... who is alleged to be in violation of [the CWA].

33 U.S.C. § 1365(a). Because civil penalty actions were not set forth separately in § 1365, the First Circuit concluded that a link exists between civil penalties and injunctive actions. *Scituate*, 949 F.2d at 556. *See Gwaltney of Smithfield Ltd. v. Chesapeake Bay Foundation*, 484 U.S. 49, 58, 108 S.Ct. 376, 382, 98 L.Ed.2d 306 (1987) (noting that "[t]he citizen suit provision suggests a connection between injunctive relief and civil penalties that is notably absent from the provision authorizing agency enforcement.")

We adopted the opposite interpretation of the scope of § 1319(g)'s bar on citizen suits in *NYCFA, supra*. We wrote:

> we note that the limitation of citizen suits previously discussed relates only to actions for civil penalties, not injunctive or declaratory relief. Thus, even if we had concluded that the state was diligently prosecuting an action against the defendants, injunctive relief would still be appropriate.

*NYCFA* 772 F.Supp. at 169.

The statement in *NYCFA* was technically dicta and did not form the basis of our holding since we held that the DEC had failed to diligently prosecute an action against the defendants. However, Judge Leval reached a similar conclusion which formed the basis of his decision in *Coalition for a Liveable Westside, Inc. v. New York Dep't of Environmental Protection*, 830 F.Supp. 194 (S.D.N.Y.1993).

Judge Leval based his holding on the plain language of the provision which "precludes

---

**14.** It is uncertain how much of the DEC's "tougher" stand resulted from the pressure of

the plaintiffs' citizen suit.

only citizen suits *seeking civil penalties.*" *Id.* at 196, (emphasis in original). In addition, he noted that the "sparse" legislative history of the amendment supported this interpretation. The Conference Committee Report states:

> No one may bring an action to recover civil penalties under section ... 505 of this Act for any violation with respect to which the Administrator has commenced and is diligently prosecuting an administrative civil penalty action. . . . [T]his limitation would not apply to (1) an action seeking relief other than civil penalties (e.g., an injunction or declaratory judgment)

H.R.Conf.Rep. No. 1004, 99th Cong., 2d Sess. at 133 (1986).[15]

Judge Leval explicitly rejected the First Circuit's holding in *Scituate* that section 1319(g)(6) barred all citizen actions. He found no basis for the First Circuit's assertion that a more limited reading of § 1319(g)'s preclusion was irrational. He wrote:

> As written, § 1319(g)(6) ensures that an entity that has violated the CWA will not be subject to duplicative civil penalties for the same violation. On the other hand, the statute permits a federal district court to entertain an action for injunctive relief for situations where, for example, a permit holder may have paid the relevant civil penalties but continues to violate its permit limitations or where the injunctive relief obtained in the state proceedings turns out to be inadequate to address the violations at issue.

*Id.*

We think that the facts of this case fall squarely within the type of situation Judge Leval asserts the preclusion provision was drafted to protect. Plaintiffs assert that, while the DEC may have assessed some penalties against the County, the County continues to discharge leachate into the Wallkill without a permit under the CWA or state law. While plaintiffs should not be allowed to seek civil penalties for the same violations that the DEC is prosecuting, the DEC's failure to secure the County's compliance with the CWA has spurred the plaintiffs' suit for declaratory and injunctive relief.

In addition, we find that the language of the CWA simply does not support a broader interpretation of the preclusion provision. It unequivocally states that any violation "with respect to which a State has commenced and is diligently prosecuting an action under state law ... shall not be subject to a *civil penalty action* under ... section 1365 of this title." 33 U.S.C. § 1319(g)(6)(A) (emphasis added). Thus, we hold that a limitation of § 1319(g)(6)'s preclusion provisions is both supported by the plain language of the statute and by the equities of the situation. As such, we grant defendants' motion to dismiss plaintiff's claim for civil penalties under the CWA, but deny their motion as to plaintiff's claims for injunctive and declaratory relief.

### 3. *Summary judgment*

■ In addition to the motion to dismiss, plaintiffs and defendants have cross-moved for summary judgment. Citing the recent case, *Atlantic States Legal Found., Inc. v. Pan American Tanning,* 993 F.2d 1017, 1020 (2d Cir.1993), defendants argue that compliance with the CWA, even if it occurs after a citizen suit is filed, renders any claim for injunctive relief moot. *See Atlantic States Legal Found., Inc. v. Eastman Kodak,* 993 F.2d 124, 127 (2d Cir.1991).

■ However, "[i]n seeking to have a case dismissed as moot ... the defendant's

---

15. Defendants argue that the legislative history of the amendment supports their position. They quote language submitted to the Congressional Record by James J. Howard, then Chairman of the House Public Works and Transportation Committee. The submission read:

> the citizen suit provision in section 505(b)(1) of the Federal Water Pollution Control act is amended to provide that no action can be commenced by a citizen if the Administrator or state has commenced and is diligently pursu-

ing the assessment of a civil penalty. . . . A citizen suit is barred not only by an EPA administrative action, but also by a State proceeding under a comparable State law.

133 Cong.Rec. H135 (January 7, 1987).

We think that this statement is somewhat ambiguous. Further, even if it clearly stated that all types of civil actions were barred, we think that Congressman Howard's unilateral submission to the Congressional Record is entitled to less weight than the Conference Report.

burden 'is a heavy one.' The defendant must demonstrate that it is *'absolutely clear'* that the allegedly wrongful behavior could not reasonably be expected to recur." *Pan American Tanning,* 993 F.2d at 1019, *quoting Gwaltney,* 484 U.S. at 66, 108 S.Ct. at 386. If a plaintiff can establish that the defendants' violations are continuing or, if after some deference is given to the state authorities "the terms of the settlement are such that a realistic prospect of continuing violation exists," the plaintiff can continue to pursue relief under the CWA. *Eastman Kodak,* 933 F.2d at 128.

Defendants argue that the current remediation program undertaken by the County and the DEC represents a comprehensive program to address the control of leachate discharges which "dispositively addressed Plaintiffs' claims, causing them to 'cease' without 'likelihood of recurrence.'"

While we agree with the defendants that plaintiffs' claim for injunctive relief would be moot should it become "absolutely clear" that future violations of the CWA could not reasonably be expected to occur, we do not find that to be the case at this time.[16]

First, we note that latest available DEC report documented nine violations for leachate entering the surface waters and 34 other leachate related violations at the landfill in 1993. Second, while it appears that the DEC and the County are finally working towards a solution to the leachate problem, even defendant's counsel will not unequivocally state that the leachate discharges will cease once the remediation plan is fully implemented.

While the DEC has hailed the plan as the "most logical approach" and the defendants' expert has concluded that it is the "best possible means of controlling leachate generation," the CWA prohibits any discharge of any pollutant into navigable waters except as authorized by the Act. *Gwaltney,* 484 U.S. at 52, 108 S.Ct. at 378. While we have some sympathy with defendants' argument that, in

light of the practical reality that the landfill was not built over an engineered liner, 100% prevention of leachate discharges may be impractical, we cannot say that defendants have established (indeed defendants do not even appear to contend) that further CWA violations will not occur.

Finally, even if we were confident that current remediation plan fully addressed the leachate problem so that no further CWA violations should occur after its implementation, given the County's current track record for complying with DEC compliance orders, we would not be able to say that such a result is absolutely certain. Indeed, arguably a good deal of the progress that has been made so far may have resulted from the plaintiffs' suit. Were we to now hold that the plaintiffs' suit is moot, we might remove the very pressure that has pushed the County this far prior to any substantial implementation of their remediation plan.

■ Plaintiffs also contend that they are entitled to summary judgment based upon defendants' past violations of the CWA. Essentially, plaintiffs argue that the documented, unpermitted leachate discharges into the Wallkill River contained in the DEC reports as well as the County's admission that the discharges violated state prohibitions on the discharge of waste or pollutants from a point source without an SPDES permit establish that they are entitled to judgment as a matter of law. While defendants argue that genuine issues of material fact remain as to whether or not their past conduct violated the CWA, because we have already dismissed plaintiffs' claim for civil penalties, we need not decide the issue.

While past violations generally can form a basis on which to infer a likelihood of recurrence, defendants have submitted evidence that measures are currently being taken to alleviate the leachate problem. In the face of contrary indicators of the County's future conduct, we cannot say that we are absolute-

---

**16.** We note even if the plaintiffs' suit for injunctive relief ultimately does become moot, they would not necessarily be precluded from recovering attorney's fees. *See Eastman Kodak,* 933 F.2d at 128 (noting "when the polluter's settlement with state authorities follows the proper

commencement of a citizen suit, one can, absent contrary evidence, infer that the existence of the citizen suit was a motive for the polluter's settlement and that the citizen suit plaintiff is therefore a prevailing party.")

ly certain that no further violations of the CWA will occur, but we also cannot say that we are convinced that future violations will occur establishing a need for injunctive relief. As such, we must deny both the plaintiffs and defendants' motions for summary judgment and await further evidence on the issue of whether or not injunctive relief would be appropriate.

## B. The Resource Conservation and Recovery Act

### 1. *Citizen Suit Provisions*

RCRA provides for three different types of citizen suits. Plaintiff has alleged claims under the first two types (the third type is a suit brought against the Administrator of the EPA). Section 6972(a)(1)(A) allows suits against any person "who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter." 42 U.S.C. § 6972(a)(1)(A). Subsection (a)(1)(A) suits usually address violations of permits, standards, and regulations.

Subsection (a)(1)(B) allows suits against any person "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." *Id.* at § 6972(a)(1)(B).

### 2. *Plaintiffs' RCRA Claims*

Plaintiffs' complaint states four claims under RCRA. First, it alleges that defendants are operating a Temporary Storage or Disposal of Hazardous Waste Facility without a permit as required by § 6925. Second, the complaint alleges that the defendants have failed to comply with operating requirements and standards, pursuant to § 6924. Both plaintiffs' first and second RCRA claim are brought pursuant to § 6972(a)(1)(A).

Plaintiffs' third claim is brought pursuant to § 6972(a)(1)(B) and alleges that defendants' "failure to prevent discharges of contaminated materials presents or threatens to present an imminent and substantial endangerment to human health and the environment."

Plaintiffs' fourth and last RCRA claim is brought under § 6972(a)(1)(A) and alleges that defendants' operation of the landfill constitutes open dumping in violation of § 6945 and 40 C.F.R. § 257.2.

### 3. *Claims One, Two and Four*

Defendants argue that plaintiffs' claims under subsection (a)(1)(A) must be dismissed because New York state's EPA authorized hazardous waste program supersedes the permit and notification requirements codified in subchapter III of RCRA.

### a. *Permit requirements and standards*

■ RCRA requires that owners and operators of facilities for the treatment, storage, or disposal of hazardous waste must obtain permits pursuant to § 6925. It also requires that such individuals comply with standards promulgated by the EPA Administrator. 42 U.S.C. § 6924. However, § 6926(b) allows EPA authorized state hazardous waste programs to "carry out such program in lieu of the Federal program under [subchapter III] in such State and to issue and enforce permits for the storage, treatment, or disposal of hazardous waste (and to enforce permits deemed to have been issued under section 6935(d)(1) of this title). . . ." 42 U.S.C. § 6926(b). Subchapter III of RCRA covers hazardous waste management.

The Second Circuit has held that an EPA authorized state hazardous waste program can supersede RCRA's permit and notification requirements, so that a citizen suit pursuant to subsection (a)(1)(A) to enforce § 6925 and § 6930 is unavailable. *Dague v. City of Burlington*, 935 F.2d 1343 (2d Cir. 1991), *rev'd in part,* —— U.S. ——, 112 S.Ct. 964, 117 L.Ed.2d 130 (1992). *See City of Health v. Ashland Oil, Inc.,* 834 F.Supp. 971 (S.D.Ohio 1993) (holding that "a citizen suit is not available in an authorized state for an alleged violation of a federal provision superseded by state law pursuant to 42 U.S.C. § 6926(b)"); *Thompson v. Thomas*, 680 F.Supp. 1, 3 (D.D.C.1987) (holding where the EPA has authorized a state to administer

and enforce its own hazardous waste program, federal regulations promulgated under RCRA have been superseded and any alleged violations of state regulations must be brought in state court pursuant to state law).

New York received final authorization under § 6926(b) to administer and enforce its own hazardous waste program on May 29, 1986. 57 Fed.Reg. 9978 (March 23, 1992). Plaintiffs concede that citizen suits can not be used to enforce RCRA's permitting regulations. As such, we must grant defendants' motion to dismiss plaintiffs' first and second RCRA claims.[17]

b. *Section 6945(a)*

Even if § 6926(b) is interpreted as precluding citizen suits to enforce federal permitting requirements and standards relating to hazardous waste, plaintiffs argue that their subsection (a)(1)(A) citizen suit is still viable to the extent that they seek to enforce RCRA's open dumping provisions. Defendants concede that open dumping claims are not superseded by state hazardous waste programs adopted pursuant to § 6926(b). While § 6926(b) authorizes states to carry out their own hazardous waste management programs in lieu of the Federal program promulgated under subchapter III, RCRA's open dumping provisions are found in subchapter IV, which seeks to develop and encourage methods to dispose of solid waste in an environmentally sound manner, 42 U.S.C. § 6941, and are not superseded by state programs authorized to carry out the goals of subchapter III. *See Lutz v. Chromatex*, 718 F.Supp. 413, 425–26 (M.D.Pa.1989) (denying

a motion to dismiss as to plaintiffs' open dumping claim since open dumping provisions are found in subchapter IV).

Despite their concession, defendants argue that plaintiffs' open dumping claim fails as a matter of law. As such, they contend that they are entitled to summary judgment. Plaintiffs have cross-moved for summary judgment as to the open dumping claim. We note that summary judgment is proper where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

i. Open dumping provisions

Section 6945(a) provides:

> any solid waste management practice or disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste or hazardous waste is prohibited, except in the case of any practice or disposal of solid waste under a timetable or schedule for compliance under this section. The prohibition contained in the preceding sentence shall be enforceable under section 6972 of this title against persons engaged in the act of open dumping.

42 U.S.C. § 6945(a). The responsibility of promulgating regulations to determine which facilities will be classified as open dumps is delegated to the EPA Administrator. *Id.* at § 6944.

The regulations provide that facilities failing to satisfy certain criteria set out at 40 C.F.R. Part 257 will be considered open dumps for purposes of RCRA. *Id.* at § 257.-1(a)(1). However, the regulations list several

---

17. Defendants argue because we have dismissed plaintiffs' first and second RCRA claims, the third and fourth RCRA claims must be dismissed as plaintiff did not comply with the 60–day waiting period after notice for (a)(1)(A) claims and the 90–day waiting period for (a)(1)(B) claims. *See* 42 U.S.C. §§ 6972(b)(1)(A) and (2)(A). We disagree.

RCRA's waiting period requirements specifically state that both (a)(1)(A) and (a)(1)(B) actions may be brought "immediately after notification in the case of an action under this section respecting a violation of subchapter III of this chapter." *Id.* §§ 6972(b)(1)(A) and (b)(2)(A). The Second Circuit has also held in the case of such a "hybrid complaint" the waiting periods are inapplicable. *Dague*, 935 F.2d at 1352.

Defendants argue that the "hybrid complaint" exception should not apply where plaintiff's claims based upon violation of subchapter III have been dismissed. In *Dague*, the Second Circuit noted the danger that "plaintiffs could circumvent the delay requirements by simply asserting a subchapter III claim, whether or not the claim has merit." *Id.* While it found that the argument raised some concern, it also found that the concern did not outweigh Congress's intent to encourage quick enforcement of subchapter III. It also found that the threat of rule 11 sanctions might alleviate the problem of frivolous claims. *Id.* at 1352.

exceptions. Among them is an exception for "municipal solid waste landfill units" which are subject to revised criteria set out in part 258. *Id.* at § 257.1(c)(10).

Defendants contend that their actions do not constitute open dumping because the landfill constitutes a municipal solid waste landfill ("MSWLF") unit and their actions are in compliance with applicable regulations MSWLFs. In the alternative, they argue that they are operating under a timetable or schedule for compliance.

### ii. Applicable regulations

Plaintiffs claim that the landfill is covered by part 257 of the regulations which sets forth the criteria for solid waste disposal and that the landfill violates part 257.3–3(a) and 257.3–4(a), 40 C.F.R. §§ 257.3–3(a) and 257.3–4(a).

Part 257.3–3(a) provides "a facility shall not cause a discharge of pollutants into waters of the United States that is in violation of the requirements of the National Discharge Elimination System ("NPDES") under section 402 of the Clean Water Act, as amended [33 U.S.C. § 1342]." Plaintiffs assert the continuing discharge of leachate into the Wallkill River without a § 402 permit constitutes an open dumping practice.

Part 257.3–4(a) provides that a facility "shall not contaminate an underground drinking water source beyond the solid waste boundary or beyond an alternative boundary specified in accordance with paragraph (b) of this section." "Contaminate" is defined as the introduction of a substance which would cause

(i) The concentration of that substance in the ground water to exceed the maximum contaminant level specified in Appendix I, or (ii) An increase in the concentration of that substance in the ground water where the existing concentration of that substance exceeds the maximum contaminant level specified in Appendix I.

40 C.F.R. § 257.3–4(c)(2).

Since 1987, monitoring wells outside the perimeter of the landfill have exhibited forty instances where the concentration of certain substances exceeded the maximum containment level ("MCL") parameters for those substances as specified in Appendix I to 40

C.F.R. part 257. These substances include arsenic, barium, chromium, and lead. Plaintiffs assert that these exceedances establish a violation of RCRA's open dumping provisions.

Rather then contesting plaintiffs' evidence that the landfill fails to comply with part 257, defendants contend that the landfill is exempt from its regulatory requirements because it qualifies as a municipal solid waste landfill ("MSWLF") and, as such, is regulated by part 258.

Subpart 258.1, which sets forth the "Purpose, scope, and applicability of part 258," provides that

MSWLF units which receive waste after October 9, 1991 but stop receiving waste before October 9, 1993 are exempt from all requirements of this part 258, except final cover requirements specified in § 258.-60(a). The final cover must be installed within six months of the last receipt of wastes. Owners or operators of MSWLF units described in this paragraph that fail to complete cover installation within the six month period will be subject to all the requirements of this part 258, unless otherwise specified.

40 C.F.R. § 258.1(d).

In this instance, the landfill received waste after October of 1991, but ceased receiving waste prior to October 3, 1993. Plaintiffs argue if the landfill is not covered by part 258, it must be covered by part 257. Defendants argue that neither part 257, nor 258 apply and claim that the only applicable regulation is the cover requirement contained at part 258.60(a).

Examining the regulations, it is clear that the landfill is not covered by part 258, except for part 258.60(a)'s final cover requirements, unless cover installation was not completed within six months of the last receipt of waste in which case the landfill is subject to all requirements of part 258.

While it is undisputed that the landfill ceased receiving waste on January 31, 1992, it is not clear at this juncture whether final cover installation was completed by July 1, 1992. Because the parties have not ade-

quately briefed the issue of whether or not the final cover installation occurred, we cannot decide the issue of whether or not the landfill is covered by part 258.[18] Because a genuine issue of material fact remains as to whether or not the landfill is covered by part 258, we do not reach plaintiff's argument that in the absence of coverage under part 258, the landfill must be covered by part 257.

### iii. Compliance plan

■■■ Defendants assert, even if they are, or have, engaged in open dumping as defined by the relevant regulations, such dumping is not prohibited under § 6945(a) because the landfill is operating under a schedule for compliance. They contend that the compliance schedules and timetables included in the consent orders constitute schedules for compliance under the open dumping provision.

Open dumping is only permissible to the extent that it occurs under "a timetable or schedule for compliance established under this section [§ 6945]". 42 U.S.C. § 6945(a). Section 6945 discusses the adoption of state plans to achieve the objectives of subchapter IV. It states that such plans shall require that all existing open dumps comply with measures promulgated by the EPA Administrator. If an entity establishes that it has considered alternatives for solid waste management which comply with the open dumping provisions but is unable to utilize such alternatives, the plan must establish

> a timetable or schedule for compliance for such practice or disposal of solid waste which specifies a schedule of remedial measures, including an enforceable sequence of actions or operations, leading to compliance with the prohibition on open dumping of solid waste within a reasonable time.

*Id.* § 6945(a).

Plaintiffs argue that the landfill is not operating under a schedule for compliance as contemplated by § 6945 because the schedule under which the landfill is operating is not calculated to bring the landfill into compli-

ance with § 6945(a). They maintain that while the proposed cap will reduce leachate generation, it will not eliminate leachate discharges. They cite a 1989 management plan prepared by Wehran Engineering, an engineering firm hired by the County, which estimated that 5,000 gallons of leachate per day would continue to be generated after landfill closure.

Defendants have submitted the affidavit of Howard LaFever, a partner at Stearns & Wheler, an environmental engineering firm hired by the County. LaFever states that in addition to the capping of the landfill, the solution adopted by the County and DEC to eliminate leachate discharge includes the County's Interim Leachate Control Plan as well as the adoption of any alternative remediation deemed necessary at the conclusion of the RI/FS process. LaFever also states in his opinion "the capping of the Landfill is the best possible means of controlling leachate generation at the Landfill."

Plaintiffs concede that much of the water that produces leachate comes from precipitation so that a properly designed and constructed final cap will greatly reduce the amount of leachate produced. However, plaintiffs argue (and defendants concede) that the cap will not completely eliminate leachate flow.

First, even if the cap were to keep precipitation from entering into the landfill, a leachate mound has been identified at the landfill. The mound is composed of fluid within the refuse pile which rises above the normal groundwater elevation.[19] Estimates of the mound's size range from twenty to more than thirty feet high. A radial flow occurs in all directions from the mound. Additionally, leachate from the mound can flow into surrounding ground and surface waters.

Second, plaintiffs argue that the existing leachate collection system is insufficient to prevent leachate from escaping into the Wallkill. They note that a 1990 memorandum from Steven Parisio, a DEC geologist, stated

---

**18.** If the landfill is covered by part 258, the defendants still may have violated RCRA's open dumping provisions if the landfill failed to comply with the criteria contained therein.

**19.** Leachate mounds generally occur because normal landfill operations can segregate landfills into different compartments and areas of low permeability can trap leachate.

that "[b]ecause the existing perimeter leachate collection trench does not extend to the top of the silt and clay unit it is likely that some of this flow is passing below the trench and ultimately into the Wallkill River or a tributary stream."

Finally, plaintiffs argue the current system does not address downward leachate through sand and gravel windows in the silt/clay unit.

Because defendants have failed to establish conclusively that they are operating under a DEC schedule which will ultimately bring them into full compliance with § 6945(a), we deny their motion to dismiss plaintiffs' § 6972(a)(1)(A) RCRA citizen suit for violation of § 6945(a). Further, as we have already stated, a genuine issue of material fact remains as to whether or not the defendants are covered by the regulations contained at 40 C.F.R. Part 257. Accordingly, we also deny the parties' cross motions for summary judgment.

### 4. *Claim Three*

Plaintiffs' third RCRA claim is brought under § 6972(a)(1)(B). Defendants argue that RCRA prohibits subsection (a)(1)(B) citizen suits where a state is diligently prosecuting an action. The provision reads:

> No action may be commenced under subsection (a)(1)(B) of this section if the State, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment—
>
> (i) has commenced and is diligently prosecuting an action under subsection (a)(1)(B) of this section,
>
> (ii) is actually engaging in a removal action under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 U.S.C.A. § 9604].
>
> (iii) has incurred costs to initiate a Remedial Investigation and Feasibility Study under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 U.S.C.A. § 9604] and is diligently proceeding with a remedial action under that Act.

42 U.S.C. § 6972(b)(2)(C). Defendants argue that all three of the prohibitions contained in subsection (b)(2)(C) apply here to bar plaintiffs' (a)(1)(B) claim. We consider each argument in turn.

#### a. *Subsection (b)(2)(C)(i)*

Plaintiffs and defendants first wrangle over whether the limitation contained in subsection (b)(2)(C)(i) applies where the state has commenced an administrative action rather than an action in court. Plaintiffs note that subsection (C)(i) bars a citizen suit where the state is diligently prosecuting an action under subsection (a)(1)(B). Section (a)(1) states: "[a]ny action under paragraph (a)(1) of this subsection shall be brought in the district court in which the alleged violation occurred." Plaintiffs assert the language of section (a)(1) implies that an action under the section must be an action brought in district court.

Defendants argue that Congress's failure to specifically limit the preclusion provision in subsection (b)(2)(C)(i) to instances where a state is diligently prosecuting a civil or criminal action in federal or state court implies that administrative actions should be interpreted as barring (a)(1)(B) suits as well. They note that the preclusion provisions for (a)(1)(A) actions specifically require that the EPA Administrator or the State be "diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance." 42 U.S.C. § 6972(b)(1)(B). They claim that Congress would have used similar language in (b)(2)(C)(i) had it intended to exclude administrative actions from the preclusion provisions.

While Congress could have stated its intent with more precision, we hold that subsection (b)(2)(C)(i) only prohibits (a)(1)(B) claims where a state has brought an action in court. Had Congress intended for state administrative actions to preclude (a)(1)(B) citizen suits, it would have simply stated that such citizen suits cannot be commenced where the state has "commenced and is diligently prosecuting an action." Instead Congress required that the state be diligently prosecuting an action *under subsection*

*(a)(1)(B).* The use of such language can only be interpreted as incorporating the limitations on § 6972(a)(1)(B) actions into the preclusion provisions.

Section 6972 is entitled "citizen suits." Section (a) provides that "any person may commence a civil action on his own behalf–" and then lists the three type of citizen suits. There are no separate provisions contained in section (a) for actions brought by the state. As such, each of the three subsections only contemplate a state bringing a civil action, just as any other person or citizen. Thus, we agree with plaintiffs that state administrative action cannot be deemed an action under subsection (a)(1)(B) for purposes of subsection (b)(2)(C)(i) and proceed to discuss whether or not plaintiffs' (a)(1)(B) claim is prohibited under subsection (b)(2)(C)(ii) or (iii).

### b. *Subsection (b)(2)(C)(ii) and (iii)*

#### i. CERCLA provisions

In order to better understand defendants' motion under subsections (b)(2)(C)(ii) and (iii), we are forced to examine CERCLA. Specifically at issue are two sections of the statute §§ 9604 and 9607.

Section 9604(a), entitled in part "Removal and other remedial action by President," authorizes the President

> to act, consistent with the national contingency plan to remove or arrange for the removal of, and provide for remedial action relating to [any hazardous substance or any pollutant or contaminant which may present an imminent and substantial danger to the general health or welfare which is released or poses a substantial threat of release into the environment]

42 U.S.C. § 9604(a). Section (a) also provides when the President determines that such action will be done promptly and properly by a responsible party, "the President may allow such a person to carry out the action" in accordance with § 9622 which contains CERCLA's settlement provisions.

Subsection (d)(1)(A) discusses state involvement in § 9604 actions. It reads:

> A State or political subdivision thereof or Indian tribe may apply to the President to carry out actions authorized in this section. If the President determines that the State or political subdivision or Indian tribe has the capability to carry out any or all of such actions in accordance with the criteria and priorities established pursuant to section 9605(a)(8) of this title and to carry out related enforcement actions, the President may enter into a contract or cooperative agreement with the State or political subdivision or Indian tribe to carry out such actions. The President shall make a determination regarding such an application within 90 days after the President receives the application.

42 U.S.C. § 9604(d)(1)(A).

Defendants contend that plaintiff's (a)(1)(B) RCRA claim must be dismissed because 1) the DEC was engaging in a removal action under § 9604 and/or 2) the DEC had incurred costs to initiate a Remedial Investigation and Feasibility Study under CERCLA § 9604.[20]

Plaintiffs do not contest that the DEC is remediating the landfill. However, they assert that its actions are solely pursuant to state law. Thus, they contend, while the DEC may be able to recover its response costs from "potentially responsible parties" ("PRPs") through the liability provisions contained at § 9607 of CERCLA, because the state did not enter into a cooperative agreement with the EPA, pursuant to § 9604(d), defendants' contention that the DEC was engaging in a removal action and/or incurred costs to initiate an RI/FS and was diligently proceeding with a remedial action under

---

**20.** Based upon their assertions that the DEC has been engaging in a removal or remedial action, defendants assert that our jurisdiction is barred by CERCLA § 113(h), 42 U.S.C. § 9613(h) which divests federal courts of jurisdiction, other than diversity jurisdiction under 28 U.S.C. § 1332, to review any challenges to removal or remedial action under § 9604. They assert that both the plaintiffs' CWA and RCRA claims constitute an impermissible collateral attack on a CERCLA removal or remedial action.

The soundness of defendants' contention turns on whether or not the DEC's actions can properly be characterized as a removal or response action under § 9604 which we discuss *infra.*

§ 9604 when plaintiffs' action was commenced must fail.

### ii. RCRA subsection 6972(b)(2)(C)(ii)

In order for the prohibition contained in subsection (b)(2)(C)(ii) to bar plaintiffs' (a)(1)(B) RCRA claim, defendants must establish that the DEC was engaging in a "removal action" under CERCLA § 104. CERCLA defines "removal" as

> the clean-up or removal of released hazardous substances from the environment, such actions as may be necessary [sic] taken in the event of the threat of release of hazardous substances into the environment, *such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances,* the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result from the release or threat of release.

42 U.S.C. § 9601(23) (emphasis added).[21]

Defendants contend that removal actions took place as early as 1988 with the Gibbs and Hill site investigation and that DEC efforts at the landfill constitute a removal action because they were "conducted in accordance with Section 104 of CERCLA and its regulations."

We note that RCRA § 6972(b)(2)(C)(ii) bars (a)(1)(B) actions where the state is actually engaged in a removal action *under section 104 of [CERCLA].* Thus, the fact that the DEC may have engaged in removal actions is insufficient alone to satisfy the requirements of § 6972(b)(2)(C)(ii) if defendants cannot establish that the DEC's efforts constituted a removal action *under CERCLA § 104.*

An examination of § 9604 compels us to hold that, as a general rule, only the President (who has delegated his authority to the Administrator of the EPA) can carry out a "removal action" under § 9604. However, there are two exceptions which are also found in § 9604. The President may allow a responsible party to carry out a removal or remedial action pursuant to a settlement agreement or, more relevant to this case, the President may enter into a contract or cooperative agreement which allows a state, political subdivision, or Indian tribe to carry out the actions authorized in § 9604. 42 U.S.C. §§ 9604(a) and (d)(1). Because the DEC was not authorized by the President or the EPA to carry out a removal action, defendants have failed to establish that plaintiff's (a)(1)(B) RCRA claim is prohibited by the restrictions contained at § 6972(b)(2)(C)(ii).

Defendants argue that § 9604 must be read with § 9607. They contend that because the DEC was arguably engaged in a removal action prior to the filing of plaintiffs' complaint, the costs of which may be recovered from certain responsible parties under § 9607(a)(4)(A), the DEC's efforts should be deemed a removal action under § 9604 despite the fact that the DEC was not engaged in a joint federal-state cooperative agreement under § 9604(d)(1). As such, they argue that plaintiffs' RCRA (a)(1)(B) claim is barred.

There is no dispute that states can act on their own to clean up sites covered by CERCLA. "Congress envisioned states' using their own resources for cleanup and recovering those costs from polluters under section 9607(a)(4)(A)." *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1047 (2d Cir. 1985). *See New York v. General Elec. Co.,* 592 F.Supp. 291, 303 (N.D.N.Y.1984); *State ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300, 1315 (N.D.Ohio 1983). However, unlike removal actions under § 9704, such unilateral state actions are not eligible for Superfund money. *See* 42 U.S.C. § 9611(a)(1).

Defendants argue that a § 9604 action must precede a § 9607 recovery action be-

---

21. 
"Remedial action" is defined as those actions consistent with a permanent remedy taken instead or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. *Id.* at § 9601(24). The term response includes both removal and remedial action. *Id.* at § 9601(25).

cause § 9607 appears to have been drafted with § 9604 in mind. *See United States v. Rohm and Haas,* 2 F.3d 1265, 1278 (3rd Cir.1993). While it is undoubtedly true that Congress drafted § 9607 so that federal, state, and local governments and Indian tribes would be able to recover the costs of § 9604 removal and remedial actions from responsible parties, it does not follow that only costs incurred from § 9604 actions are recoverable under § 9607.

First, we note that subsection (a)(4)(A) of § 9607 which allows recovery of "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan" is followed by three other subsections which allow recovery for costs and damages which cannot be said to have been incurred pursuant to an action under § 9604. Second, if Congress had intended that removal or remedial actions under § 9604 be synonymous with removal or remedial actions as referred to in § 9607, there would have been no need for it to have used the phrase "removal action *under section 104*" when it drafted the prohibition contained at § 6972(b)(2)(C)(ii) of RCRA.

Several courts have considered the relationship between § 9604 and § 9607 in the context of whether or not a state can recover response costs for a clean up which was not performed in accordance with the national contingency plan since § 9604 requires that the President act "consistent with the national contingency plan." [22] In *New York v. General Elec. Co.,* 592 F.Supp. at 302 (citations omitted), Judge Miner wrote:

> It is clear beyond doubt that the liability provisions are independent of the national priorities list of sites eligible for Superfund money, since the 'requirement for a National Priorities List was not intended to

be a limitation on liability but rather was the result of the great concern voiced in Congress that the limited trust fund money is not be used for ill-conceived or disorganized clean up efforts.

Judge Miner explained § 9604 and § 9607 as two separate methods of addressing the clean up of hazardous waste sites which, though designed to work in tandem, are not coterminous. He wrote:

> It is clear that CERCLA's approach to the serious problems generated by the disposal of hazardous wastes embodied a bifurcated remedial scheme. This dual approach entailed imposition of liability on waste generators on the one hand, *see* 42 U.S.C. § 9607, and the creation of Superfund on the other. *See* 42 U.S.C. §§ 9604, 9605, 9611 & 9612. The liability provisions were an essential element of the statute because the Fund itself could not adequately remedy the pervasive waste problem.

*Id.* (citations and footnotes omitted).

Other courts considering the issue have also held that § 9604 and § 9607 operate independently. *See United States v. Northeastern Pharmaceutical & Chemical Co.,* 579 F.Supp. 823, 850 (W.D.Mo.1984), *aff'd in part, rev'd in part,* 810 F.2d 726 (8th Cir. 1986); *Georgeoff,* 562 F.Supp. at 1315.

This interpretation is buttressed by the different language used in the two sections. Section 9604 authorizes the President to act "consistent with the national contingency plan" whereas section 9607, adopting a broader scope, imposes liability for all costs of removal or remedial action "not inconsistent with the national contingency plan." *Accord United States v. Wade,* 577 F.Supp. 1326, 1336 (E.D.Pa.1983); *United States v. Reilly Tar and Chemical Corp.,* 546 F.Supp. 1100, 1118 (D.Minn.1982).[23]

---

**22.** Section 9605(a)(8)(A) provides that the national contingency plan shall include a national priorities list ("NPL") which prioritizes known releases or threatened releases throughout the United States for the purpose of taking remedial action. EPA regulations state that "[o]nly those releases included on the NPL shall be considered eligible for Fund-financed remedial action." 40 C.F.R. § 300.425(b)(1). However, the regulations make clear that "[r]emoval actions (including remedial planning activities, RI/FS, and oth-

er actions taken pursuant to CERCLA [§ 9604(b)]) are not limited to NPL sites." *Id.*

**23.** The Second Circuit was faced with a case involving a state seeking recovery of response costs under § 9607 for a site which was not listed on the NPL. However, it did not reach the issue of the interdependency of §§ 9604 and 9607, holding instead that NPL listing is only a limitation on remedial actions as opposed to removal or short-term actions. *Shore Realty*

After close examination of the statutory provisions and relevant cases on the subject, we hold that although §§ 9604 and 9607 were drafted to work together, their provisions are not coterminous. As such, while the costs incurred by the DEC may be recoverable under § 9607, its actions do not constitute a removal action under § 9604. Accordingly, we hold that plaintiffs' RCRA (a)(1)(B) claim is not barred by § 6972(b)(2)(C)(ii).

iii. RCRA subsection 6972(b)(2)(C)(iii)

■ As for subsection (C)(iii), defendants contend that the DEC's remedial efforts have been conducted in accordance with § 9604 and its regulations contained at 40 C.F.R. Part 300. They note that state regulations incorporate the federal regulations pertaining the NCP, 6 N.Y.C.R.R. § 375–1.1(f)(1) and that the state regulations provide that "[t]he program for a site must not be inconsistent with the National Oil and Hazardous Substances Pollution Contingency Plan of March 8, 1990." Similarly, the 1993 Consent Order states that

> [t]he RI/FS Work Plan shall incorporate all elements of a RI/FS as set forth in [CERCLA], the [NCP], the USEPA guidance document entitled 'Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA,' dated October 1988 and any subsequent revisions to that guidance document in effect at the time that the RI/FS Work Plan is submitted, and appropriate USEPA and Department technical and administrative guidance documents.

While plaintiffs do not dispute that DEC remedial actions were not inconsistent with the NCP so that the DEC may be entitled to recover its costs from PRPs, because defendants have not established that the DEC incurred costs to initiate a Remedial Investigation and Feasibility Study ("RI/FS") pursuant to a joint federal-state cooperative

agreement under § 9604(d)(1), they have failed to establish that the DEC's actions were undertaken pursuant to § 9604. As such the prohibition contained in subsection (b)(2)(C)(iii) does not apply.

Because we hold that neither subsection (i), (ii), or (iii) of RCRA § 6972(b)(2)(C) bars plaintiffs' (a)(1)(B) RCRA claim, we deny defendants' motion to dismiss the (a)(1)(B) claim. We now proceed to address plaintiffs' motion for summary judgment.

d. *Summary judgment*

■ Section 6972(a)(1)(B) authorizes a RCRA citizen suit against "any person ... who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent or substantial endangerment to health or the environment."

In support of their motion, plaintiffs submit the affidavits of Michael A. Lane, a geologist with expertise in solid waste management, and Ward Stone, a wildlife pathologist with the DEC. According to Lane, a number of hazardous chemicals, including iron, manganese, sulfate, arsenic, lead, barium, chromium, phenols, trichloroethene, toluene, chlorobenzene, ethylbenzene, xylenes, benzoic acid, and DDT, have been detected in the landfill leachate.[24]

Stone states that "the elevated levels of toxics detected in the [1992 water and soil] samples taken from the Orange County Landfill Property definitely have an adverse effect on a wide range of organisms." He also states,

> Large unlined, incompletely capped landfills, like the Orange County Landfill, pose a potential threat to the surrounding environment for hundreds of chemicals. The Orange County Landfill is especially a

---

*Corp.,* 759 F.2d at 1046. Because the Court of Appeals held that NPL listing was not a requirement for a removal action under § 9604 making the state's actions consistent with § 9604 as well as reimbursable under § 9607, it did not reach the question of whether a state's action must meet the requirements of § 9604 in order for the state to recover its costs under § 9607.

**24.** Plaintiffs have also submitted the results of ground water monitoring which show MCL exceedances for barium, arsenic, mercury, chromium, and lead. However, defendants challenge their reliability based upon the fact that other potential sources of contamination may have contributed to the concentrations and because all of the contaminants are naturally occurring in the area.

threat because the landfill and its toxics are nearly on the bank of a river that serves as important fish and wildlife habitat.

In July of 1989, Wehran prepared a "Leachate Management Report" based upon two samples taken from the landfill seepage control system in 1988. The Report showed that the level of lead contained in the leachate exceeded the MCL in both samples and that the level of mercury exceeded the MCL in one of the samples. DEC monitoring reports show that three samples of leachate taken from the landfill's collection storage tank in 1992 exceeded the MCLs for lead and barium.

Defendants argue that plaintiffs are not entitled to summary judgment because a genuine issue of material fact remains as to whether the defendants' conduct "may present an imminent and substantial endangerment to health or the environment."[25] Defendants argue while MCL exceedance may serve as some evidence that the landfill "may present an imminent and substantial endangerment to the environment," an exceedance need not always establish an (a)(1)(B) violation. Indeed, defendants argue that plaintiff's evidence only establishes *de minimis* exceedances.

While we reiterate that the operative word in § 6972(a)(1)(B) is *may* and plaintiffs need not establish "an incontrovertible 'imminent and substantial' harm to health and the environment," *see Gache v. Harrison,* 813 F.Supp. 1037, 1044 (S.D.N.Y.1993), we are uncomfortable granting summary judgment at this juncture in light of the disputes between the various experts as to the effect of the landfill on the health and environment. Therefore, we deny plaintiffs' motion for summary judgment as to the RCRA § 6972(a)(1)(B) claim.

## C. Pendent State Law Claims

▮ Because several of the plaintiffs' federal causes of action remain, we cannot dismiss the state law claims pursuant to 28 U.S.C. § 1367(c)(3). Further, while defendants appear anxious to renew their argument that the state claims predominate over the federal claims, we see no reason to revisit our March 6, 1992 decision denying defendant's prior motion to dismiss pursuant to § 1367(c)(2).

▮ Defendants also argue that the state law claims should be dismissed because the Soons failed to file a notice of claim pursuant to N.Y.Gen. Municipal Law § 50–e. New York law provides that

> Any claim or notice of claim against any county for damage ... or for invasion of personal or property rights, of every name and nature, and whether causal or continuing trespass or nuisance and any other claim for damages arising out of law or in equity, alleged to have been caused or sustained in whole or in part by or because of because of any misfeasance, omission of duty, negligence or wrongful act on the part of the county, its officers, agents, servants or employees, must be made and served in compliance with section fifty-e of the general municipal law.

N.Y.County Law § 52(1).

Section 50–e provides

> [i]n any case founded upon tort where a notice of claim is required by law as a condition precedent to commencement of an action or special proceeding against a public corporation ... the notice of claim shall comply with and be served in accordance with the provisions of this section within ninety days after the claim arises. Municipal Law § 50–e(1)(a). Such notice must be served within 90 days after the claim arises.

*Id.* at § 50–e(1)(a).

Defendants argue, to the extent that plaintiffs' claim the applicability of the continuing tort exception, *see Rapf v. Suffolk County,*

---

**25.** Defendants also argue that plaintiffs' motion should be denied because they have failed to establish that "hazardous wastes" as defined by RCRA were at the landfill. We do not think that such a showing is required as § 6972(a)(1)(B) is satisfied if the defendants contributed to the

"past or present handling, storage, treatment, transportation, or disposal of any *solid* or hazardous waste which may present an imminent or substantial endangerment to health or the environment" (emphasis added).

755 F.2d 282, 292 (2d Cir.1985), case law in the area has become unsettled in light of a recent New York Court of Appeals case, *Jensen v. General Elec. Co.,* 82 N.Y.2d 77, 603 N.Y.S.2d 420, 623 N.E.2d 547 (1993).

However, *Jensen* only applies to damages and does not purport to affect the availability of suits for injunctive relief, *id.* at 89–90, 603 N.Y.S.2d 420, 623 N.E.2d 547, and it is settled law that a notice of claim is not required where the parties primarily seek equitable relief. *See Rapf v. Suffolk County,* 755 F.2d 282, 292 n. 7 (2d Cir.1985); *Fontana v. Hempstead,* 18 A.D.2d 1084, 239 N.Y.S.2d 512, 513 (2d Dep't 1963). Therefore, we deny defendants' motion to dismiss the Soons' state law claims.[26]

CONCLUSION

In summary, we grant defendants' motion to dismiss plaintiffs' CWA claim to the extent that plaintiffs seek civil penalties, but deny the motion as to injunctive relief. We also grant defendants' motion to dismiss plaintiffs' first and second RCRA claims, but deny their motion to dismiss the third and fourth RCRA claims. We also deny defendants' motion to dismiss the Soons' pendent state law claims.

Finally, the parties' cross-motions for summary judgment are denied.

SO ORDERED.

---

**26.** Plaintiffs also argue that *Jensen,* which concerns the interpretation of N.Y. C.P.L.R. § 214–c, is inapplicable here because the notice of claim period and not the limitations period is at issue and that the *Jensen* decision is limited to claims arising from latent exposures to substances. Because the Soons are primarily seeking injunctive relief, we need not reach these arguments.